Filed 7/28/11

# IN THE SUPREME COURT OF CALIFORNIA


| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S082828 |
| v. | ) | |
| | ) | |
| CORRELL LAMONT THOMAS, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCE171425 |
| _____ | ) | |


Defendant Correll Lamont Thomas was convicted of the first degree murder of Creed Grote and the attempted murder of Troy Ortiz. He was also convicted of the second degree murder of Ricky McDonald.[1] As special circumstances of the Grote murder, the jury found that defendant lay in wait,[2] discharged a firearm from a vehicle with intent to inflict death,[3] and committed multiple murders.[4] It also found that defendant personally used a firearm[5] in the

---

[1]     In the McDonald case, codefendant Kazi Cooksey was also convicted of second degree murder. Nicole Halstead was also charged in the Grote/Ortiz and McDonald matters. She pled guilty to one count of voluntary manslaughter against Grote. The other charges against her were dismissed. Pursuant to that plea agreement she testified against defendant and Cooksey.

[2]     Penal Code section 190.2, subdivision (a)(15). All further statutory references are to the Penal Code unless otherwise indicated.

[3]     Section 190.2, subdivision (a)(21).

[4]     Section 190.2, subdivision (a)(3).

[5]     Section 12022.5.

1

Grote/Ortiz crimes, and that he thereby intended to inflict great bodily injury or death upon Grote.[6] Finally, the jury found that defendant had two prior serious felony convictions within the meaning of the "Three Strikes" law.[7] Defendant was sentenced to death.

This appeal is automatic. We affirm the judgment.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. *The Murder of Ricky McDonald*

##### *a. Prosecution Evidence*

Nicole Halstead, defendant's girlfriend,[8] was a principal prosecution witness. Before relating the facts surrounding the Ricky McDonald murder, Halstead testified about a violent encounter that defendant and Kazi Cooksey had with Darrell Milton an hour earlier. Neither defendant nor Cooksey were charged with crimes against Milton. The evidence relating to this assault was, nonetheless, admitted "for the limited purpose of determining if it tends to show the intent and/or mental state" that was a necessary element of the McDonald murder.

According to Halstead, around midnight on May 17, 1996, she, defendant, and Cooksey went to a liquor store where they encountered Darrell Milton. Milton was drunk and verbally harassing everyone going in or out of the store. As they left the store, two other men rushed Milton and hit him in the face.

---

**6** Section 12022.55.
**7** Section 667, subdivisions (b)-(i).
**8** During the period covering the charged offenses defendant was married to Arlene Thomas. However, he maintained relationships with a number of other women including Halstead.

2

Defendant and Cooksey joined in the attack. Defendant kicked Milton "real hard … over and over." Cooksey knelt over Milton and punched him.

Milton was hospitalized for three days. He and his companion Kevin Collins both testified the attack was unprovoked. Neither man could identify defendant or Cooksey.[9]

Defendant, Cooksey, and Halstead then drove four or five miles back to an apartment complex where Cesar Harris lived. Before going to the liquor store, the three had been socializing with Harris and Carolyn Lanham[10] at a picnic table in front of Harris's apartment. Thirty to 45 minutes after they returned, Harris's neighbor, Ricky McDonald, drove up and crashed his truck into a wall.

Drunk and belligerent, McDonald yelled: "Why in the hell you over here making all this fucking noise . . . . by my house." Cooksey confronted McDonald, asking, "What, you got a problem?" The men argued and Cooksey punched McDonald in the jaw. McDonald said it didn't hurt and that Cooksey had better not do it again. Cooksey did it again. As McDonald staggered from the blow, defendant punched him and McDonald fell into some bushes. Defendant was "six foot four, well over 200 pounds," while Cooksey was disabled on his left side.

Defendant then kicked McDonald several times in the chest and head, but stopped at Harris's request. As McDonald lay in the bushes, breathing but unconscious, the others resumed drinking. After 20 minutes, Cooksey returned to McDonald's prone body and started punching him again, ultimately hitting McDonald in the head with a liquor bottle. He repeatedly hit McDonald so hard that Harris was surprised the bottle did not break. Harris again intervened. While

---

[9] The record does not reveal whether anyone was charged in the Milton beating.

[10] Harris and Lanham were also prosecution witnesses.

3

Cooksey stopped, defendant then "stomped" on McDonald's head several times. Stripping him, defendant slapped McDonald's buttocks. He also took McDonald's baseball cap and shoes. Harris gave Lanham McDonald's sack of takeout food.

At defendant's direction the others got into Halstead's car, but defendant lingered at the scene for almost 10 minutes. Finally, he "jumped in the car real fast." Halstead asked him what he had been doing that had taken so long. Defendant replied that McDonald was reviving, but that he "took care of that." As they drove away defendant and Cooksey were laughing about defendant's "getting his stripes." They used the slang term "M 1," which Halstead understood to mean "Murder One."

Dr. Brian Blackbourne, the medical examiner of San Diego County, assisted at McDonald's autopsy. He testified that McDonald died from multiple injuries to his head and neck.

### b. Defense Evidence

The defense theory was that McDonald died because Cooksey hit him on the head with the bottle, not because of any injuries defendant inflicted. According to Dr. John Eisele, the defense forensic pathologist, McDonald did not die as a result of injuries to his neck, but rather from blood loss and blunt force trauma to his head.

Four defense witnesses testified to Cooksey's violent character. According to one of them, Cooksey had considerable strength in his "good hand."

Finally, a former cellmate testified that Halstead told her she had kicked an unidentified man who was being beaten.

4

## 2. *The Murder of Creed Grote*

### a. *Prosecution Evidence*

A few weeks after the McDonald killing, defendant murdered Creed Grote for flirting with Halstead. Halstead and Grote's companion, Troy Ortiz, were the principal witnesses against defendant.

Halstead provided background concerning defendant's actions before the murder. She had frequently complained to him that Jesse Russell, the father of her children, abused her. On June 5, after an especially violent argument between them, Halstead phoned defendant and asked him to kill Russell. Defendant agreed. Halstead drove him to a house where he obtained a firearm. At trial Halstead was shown a TEC 9 handgun and said it was similar to the one defendant acquired that night.

Halstead then had second thoughts and tried to dissuade defendant. Defendant finally agreed but was angry with Halstead for changing her mind. Defendant drove to Don Juan Thompson's house. For several hours he drank with Thompson and quarreled with Halstead. Shortly before midnight, defendant told Halstead to drive him to the apartment of another of his girlfriends, Keisha Thomas.[11] The front passenger's seat, where defendant sat, was broken in a reclining position, so that he was not visible to the occupants of other cars.

At an intersection Halstead stopped next to a car driven by Creed Grote. Grote and his passenger Troy Ortiz flirted with Halstead, smiling and nodding at her. Halstead smiled back. Defendant said to Halstead, "Are they looking over here at you?" In a "smart mouth way," Halstead replied, "No, they're looking at you." Defendant sat up in his seat and glared at Grote and Ortiz. When Ortiz saw

---

[11] Keisha Thomas and defendant were not related.

5

defendant, he said, "Oh, fuck. We're in trouble now."**12** Grote responded, "Don't worry about it. We're not stopping to fight anyone."

When the light changed Grote sped away. Demanding that Halstead catch up with him, defendant pulled a gun from his jacket and inserted a clip of ammunition. As Halstead pulled even, defendant leaned out the window and aimed at Grote. He fired two or three shots, saying, "Fuck you." Grote's window shattered. The car veered off the road and rolled over. Ortiz pulled Grote out of the car, but he was unresponsive.

Defendant had Halstead drop him off at Keisha Thomas's home. He took his gun in with him and disassembled it there, hiding the parts around the apartment. That night Halstead told Don Juan Thompson and Carolyn Lanham what had happened. Within a few days she also told Jody Deere. Deere told Halstead she should turn herself in. When Halstead failed to do so, Deere called authorities.

The San Diego County Sheriff's Department conducted the investigation. At the scene, four 9-millimeter cartridge casings were found along the street. They all came from the same weapon. A TEC 9 is one of several types of firearms that might have expelled the cartridges. The trajectory of the bullets that hit Grote's car indicated they were fired from a position parallel to it.

An autopsy conducted by the San Diego County Medical Examiner's Office revealed that Grote was killed by three gunshot wounds to his head, neck, and torso.

---

**12** At trial Ortiz positively identified defendant as the gunman. The intersection was well lit, Ortiz's view of defendant was unobstructed, and because of the red light they stared at one another for 45 seconds to a minute.

### b. Defense Evidence

The defense theory was that defendant could not have formed the intent to kill Grote because he was under the influence of prescription sedatives and alcohol.

It was stipulated that defendant had received an initial supply of Mellaril (thioridazine) and Desyrel (trazadone) from a physician three months earlier. The prescription authorized one refill. The record was silent as to whether it had been refilled.

Defense psychiatrist Dr. Clark Smith testified that Mellaril is a "major tranquilizer." Users report that their thought processes are slowed down so much that they have trouble keeping up with the world around them. Desyrel is such a powerful sedative that it is not commonly prescribed any longer as an anti-depressant, but only as a sleep aid. Alcohol is also a tranquilizer. Ordinarily, it would have an additive effect when ingested with Mellaril or Desyrel. However, the combination might also result in agitation.

Arlene Thomas, defendant's wife, testified that he became angry when he took Mellaril and/or Desyrel with alcohol. She saw him take Mellaril and Desyrel with water on June 5th or June 6th, 1996. According to Don Juan Thompson and his girlfriend Vilma Gold, defendant drank a great deal on the night of June 5, 1996, and was quite intoxicated. On cross-examination, Thompson admitted he had lied on another unrelated occasion to protect defendant.

Over defendant's objection the charges against defendant and Cooksey in the McDonald case were tried in a single proceeding. However, the court empaneled two juries, one for each defendant, because defendant faced the death penalty in the Grote case and Cooksey was not charged in that matter. Cooksey's jury was excused during evidence pertaining to the Grote/Ortiz charges. As noted, both defendant and Cooksey were convicted of second degree murder in the

7

McDonald case, and defendant was convicted of the first degree murder of Grote and the attempted murder of Ortiz. Defendant's jury then considered the question of penalty. That jury was unable to reach a decision and was discharged. A second penalty jury was empaneled. We discuss the evidence as it was received by the second penalty jury.

**B. Penalty Phase**

*1. Prosecution Evidence*

*a. Victim impact evidence*

Jennifer Jones, Mr. McDonald's fiancée, testified he was like a father to her two children, aged seven and 15. According to Troy Ortiz, Mr. Grote's fiancée was pregnant with his son at the time of Grote's death.

*b. Evidence of defendant's other violent crimes*

The prosecution presented evidence of several crimes defendant had committed before the charged offenses.

*i. The Stockton robbery and murder*

In January of 1995, William Bird drove defendant to Stockton to visit Bird's sister Teresa, who had a child by defendant. On January 11, 1995, defendant and others were in Teresa's apartment. Because of financial difficulties, Teresa had put defendant's child up for adoption. Defendant consoled Teresa, saying that they would soon have money. He and the other men left the apartment and drove to a social club nicknamed the "Gambling Shack." They planned to force their way into the club and rob the patrons.

Upon arriving, they realized the scheme would not work because the entrance was controlled by a sequence of locked doors. They then decided to rob Prince Austin when he left the club. As Austin emerged, defendant shot at him with a pistol and a confederate fired a shotgun. Austin was killed by the shotgun

8

blast. Defendant admitted his involvement in Austin's murder to Teresa and William Bird. He also told his brother Cordell Thomas and Nicole Halstead about the crime. The record does not reflect whether defendant was prosecuted.

Two defense witnesses testified that defendant was not one of the men they had seen standing near the Gambling Shack before the shooting and running away afterwards.

### ii. *The El Cajon grossly negligent shooting*

On September 17, 1995, Nicole Halstead called defendant to her apartment in El Cajon. She told him that Jesse Russell had forced his way into the apartment, ransacked it, and choked her. Defendant responded, "This is it. I'm tired of him. . . . I'm going over there." Defendant left, accompanied by Don Juan Thompson.

Jesse Russell lived with his family on Sumner Street in El Cajon. On September 17, 1995, Russell's brother, DeMarco Atkins, was there. Late that evening defendant and another person tapped on a window and asked for Russell. Atkins recognized defendant's voice. Atkins said Russell was not there, then heard a gun being cocked. Defendant said, "Looking for Jesse. We're going to get him." The two people ran toward the front of the apartment. Atkins fell to the floor, thinking they were going to shoot into the apartment. Minutes later he did hear shots, but they did not hit the apartment. Atkins did not see who did the shooting.

### iii. *The El Cajon home invasion robbery*

Later that same night, defendant and Don Juan Thompson burst into Tashna Waits's apartment. Holding a gun, defendant ordered her guests Ronald Doss and Alton Brown to empty their pockets. Doss drew his own gun and the men exchanged gunfire. Defendant was hit. Thompson was keeping Waits,

9

Kimberly Braeutigan, and their children in a bedroom. Hearing the shots, he emerged, grabbed defendant's gun, and fled, leaving defendant behind. A San Diego County firearms examiner testified that some of the cartridge casings recovered from Waits's apartment came from a pistol found in a nearby flower bed. That same pistol produced the cartridge casings recovered near the apartment of DeMarco Atkins where defendant had threatened "to get" Jesse Russell.

### 2. *Defense Evidence*

The defense presented much the same evidence that it had in the guilt phase regarding defendant's drinking and drug ingestion and its effect on his ability to form the intent to commit murder.

According to another of Nicole Halstead's former cellmates, Halstead said that she had hit McDonald in the head with a bottle and had stomped on him with her boots.

Mitigation evidence was presented by defendant's mother and father, along with other relatives. They described defendant's childhood as characterized by neglect, abuse, and squalor.

Defendant's mother Sheila Thomas was addicted to alcohol and drugs by the time she was 13. She used her welfare checks to feed her drug habit, rather than provide for her children. Defendant's father Jimmy Thomas also used drugs. The family lived in abysmal conditions. The sheets smelled of urine; there was no food. An uncle tried to have authorities intervene. Several times defendant's maternal grandparents assumed his care.

Defendant's father Jimmy worked night shifts. When he left he would lock Sheila in the house. Yet she would sneak out regularly, leaving the children unattended. Jimmy estimated that defendant witnessed 50 to 100 physical altercations between his parents. Jimmy broke Sheila's jaw. Sheila knocked

10

Jimmy out and once pulled a gun on him. Jimmy abandoned the family when defendant was three or four years old. Thereafter his contribution to the support of his children amounted to about $5 a month. Sheila's drug use continued unabated. She stole from defendant to buy crack cocaine. When defendant was about 15, he called Jimmy to ask whether he should report Sheila to the authorities for buying drugs with her welfare checks. Jimmy counseled against it. Jimmy was incarcerated for robbery when he testified.

After Jimmy left, Sheila lived with Larry Hollings and had two more children. Sheila continued to use drugs, including PCP (phencyclidine) and "red devils." Hollings, addicted to heroin and cocaine, sold drugs from their house. When Hollings passed out, defendant would safeguard the drugs and money, returning them to Hollings in the morning. Defendant was about seven at the time. Sheila and Hollings also fought in front of the children, resulting in frequent police visits. Sheila struck defendant with leather belts and extension cords. Sometimes, because of welts on his back and legs, defendant could not walk to school, even though it was just across the street. In and out of jail during defendant's childhood, Hollings was in custody for armed robbery at the time he testified.

Several witnesses testified to defendant's good character. Larry and Terry Hollings, defendant's half brothers, were respectively, nine and five years younger than he. Because of Sheila's neglect, the responsibility for raising them largely fell upon defendant. He would wake them in the morning, get them ready for school, and attend their parent-teacher conferences.

Defendant had two children with his girlfriend Cathy. When Cathy was hospitalized with lupus, defendant stayed at her side for weeks. Throughout his incarceration defendant kept in touch with his daughter and son, then ages seven and eight.

11

Beverly Haynes and defendant lived together for two months. Defendant was very good with her severely disabled son. Years later the boy still became excited at the mention of defendant's name. When Haynes's 12-year-old daughter would run away, defendant would find and counsel her about the dangers awaiting her on the streets.

For a six-month period defendant lived with his aunt and attended church with her. Pastor Milton Chambers testified defendant was very respectful, participated in church activities, and caused no problems.

Amber Schuetzle and Christine Reardon testified that defendant prevented an enraged Kazi Cooksey from shooting Reardon during an argument.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Denial of Severance

Defendant moved to sever his two murder cases. Arguing that the Grote case was stronger, he urged that trying the incidents together would prejudice him, and that the evidence in neither case was cross-admissible in the other. The court denied the motion, noting that a joint trial is proper even in the absence of cross-admissibility. It concluded that the evidence in the McDonald case was not significantly weaker than that in the Grote murder.

Defendant's claim fails. Under section 954, joinder was presumptively proper because the two murders were crimes of the same class. The remaining question was whether defendant would be prejudiced by joinder. As we will explain, he was not.

Section 954 provides in relevant part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." The statute also provides that "the court in which a

12

case is triable, in the interests of justice and for good cause shown, may *in its discretion* order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (Italics added.)

" 'As we have often observed, because consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law. [Citations.]' (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 . . . ." (*People v. Hartsch* (2010) 49 Cal.4th 472, 493 (*Hartsch*).) When two crimes of the same class are joined, cross-admissibility is not required. (§ 954.1.)

A refusal to sever counts properly charged together is an abuse of discretion only if prejudice is clearly shown. (*Hartsch*, *supra*, 49 Cal.4th at p. 493; *People v. Soper* (2009) 45 Cal.4th 759, 771-774 (*Soper*); *Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1220 (*Alcala*).) The trial court properly exercised its discretion here.[13]

Here the statutory requirements for a joint trial were met. As the trial court observed, the two murder counts were, obviously, "offenses of the same class of crimes." (§ 954.)

When the evidence underlying properly joined charges is not cross-admissible, we consider whether the benefits of joinder sufficiently outweigh the possibility that evidence of unrelated charges might affect the jury's consideration of each set of charges. (*Soper*, *supra*, 45 Cal.4th at p. 775; *People v. Bean* (1988) 46 Cal.3d 919, 938.) In making that assessment, we consider whether: (1) some

---

[13] Relying on *Williams v. Superior Court* (1984) 36 Cal.3d 441, 454, defendant asserts that the trial court "was required to examine the propriety of [] joinder with the highest degree of scrutiny" because one of the charges was a capital offense. The record reveals the trial court applied that standard.

of the charges are particularly likely to inflame the jury against the defendant; (2) a weak case has been joined with a strong case; or (3) the joinder of the charges converts the matter into a capital case. (*Soper*, at p. 775; *People v. Arias* (1996) 13 Cal.4th 92, 127; see also *Alcala*, *supra*, 43 Cal.4th at pp. 1220-1221.) We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits. (*Soper*, at p. 775.)

None of the factors weighing against joinder are present here. The trial court concluded "the emotional impact of each murder upon the trier of fact is reasonably comparable," and the strength of the evidence in the two cases was fairly "evenly balanced." We agree. Moreover, we note that in the McDonald case, which defendant characterizes as the weaker case, he was convicted of only second degree murder. Finally, the joinder of the McDonald charges did not convert the Grote murder into a capital case. Although it did give rise to the multiple-murder special circumstance, there were two other special circumstances independent of the McDonald murder: lying in wait[14] and discharging a firearm from a vehicle with intent to inflict death.[15] (See *People v. Cook* (2006) 39 Cal.4th 566, 583; *People v. Walker* (1988) 47 Cal.3d 605, 623.)

As noted, the McDonald case was tried to separate juries. Therefore, defendant asserts, joinder "resulted in absolutely no savings of time, energy, or money." He is wrong.[16] While there were two juries, only a single courtroom, judge, prosecutor, and set of court attachés were required. (See *Soper*, *supra*, 45 Cal.4th at p. 772.) Moreover, witnesses related to the McDonald killing only

---

[14] Section 190.2, subdivision (a)(15).
[15] Section 190.2, subdivision (a)(21).
[16] A fortiori, there is no merit to defendant's claim that "[b]ecause joinder of counts conferred no benefits to the state, the normal weighing protocol applicable to a severance motion did not apply."

14

testified a single time. Thus, joinder obviated "the often significant increased burden on crime victims and witnesses that would be imposed by multiple trials." (*People v. Sutton* (2010) 48 Cal.4th 533, 560, fn. 15.)

Defendant contends a different standard should be applied in his case because there had already been a severance. He is wrong. The charges against defendant and Cooksey were tried to separate juries. However, the considerations bearing on severance of those charges were the same whether he was tried separately or jointly with Cooksey for the McDonald murder. Defendant argues that the court could have tried defendant and Cooksey jointly for the McDonald murder and then tried defendant separately for the Grote murder. That alternative was available, but by no means required. Its availability does not change the analysis. In the absence of a showing of prejudice, the order of joinder must be upheld.

Defendant next contends the denial of his severance motion was based on the false premise that critical prosecution evidence was cross-admissible. In opposing the motion, the prosecutor argued that testimony Keisha Thomas would provide was cross-admissible. He represented that Thomas would testify that after the Grote shooting defendant came to her apartment, frantically hid parts of his pistol there, and told her, "This is the second time I've done this."

Defendant's argument is itself based on a false premise. The trial court did not base its ruling on the ground that Keisha Thomas's statement would be cross-admissible. First, the court noted that "Penal Code section 954.1 expressly permits joinder of offenses in the absence of cross admissible evidence." Then it stated that in its view "there is, at most, a modicum . . . of cross admissible evidence." Finally, speaking of the prosecution's proffer of Keisha Thomas's testimony, the court asked rhetorically, "Is that single piece of evidence determinative of this motion, or should it be? In the court's view, no."

15

Defendant here renews the argument he made below: The statement he allegedly made to Keisha Thomas about having "done this" before was "insolubly ambiguous" because it was not clear what he was referring to. That argument fails because Keisha Thomas did not mention this purported statement when she testified at trial. Thus, defendant could suffer no prejudice from any ambiguity. Defendant further contends that the trial court abused its discretion in denying his motion for a retrial because the prosecution did not elicit his purported statement to Keisha Thomas. Again, defendant's argument is based on the false premise that the court permitted a joint trial because Keisha Thomas's proffered testimony in this regard would be cross-admissible.

Finally, defendant contends the trial court should have instructed the jury on its own motion that the evidence in the McDonald case was not admissible to prove his guilt in the Grote case and vice versa. The contention lacks merit because the jury received proper instruction. The point was addressed by CALJIC No. 17.02, which was given and provided in pertinent part: "Each count charges a distinct crime. You must decide each count separately." (*People v. Geier* (2007) 41 Cal.4th 555, 578-579; *People v. Catlin* (2001) 26 Cal.4th 81, 153.)

### 2. *Admission of Evidence of an Uncharged Offense*

Defendant contends the trial court abused its discretion in admitting evidence that he committed an uncharged assault on Darrell Milton an hour before he beat Ricky McDonald to death. The claim fails because defendant fails to show prejudice.

### a. *Background*

In addition to the McDonald and Grote killings and the Ortiz attempted murder, the information charged defendant with robbing McDonald and alleged the robbery as a special circumstance of the murder. The alleged robbery

16

consisted of stripping McDonald's lifeless body of its clothing and taking his shoes and bag of fast food. The court granted defendant's section 995 motion to set aside the robbery charge and special circumstance. It explained that the evidence indicated defendant formed the intent to rob only after McDonald was dead.

After Nicole Halstead pled guilty, the prosecutor made a proffer that she would provide new evidence supporting a robbery-felony-murder theory. The new evidence involved the uncharged assault on Milton. Halstead was to testify that, when McDonald approached them, defendant and Cooksey were still "hyped up" from the Milton beating and were angry that they had failed to rob him. The prosecutor argued that the evidence would be "relevant to an ongoing state of mind and evidence of [defendant's and Cooksey's] intent to rob" McDonald.

The court ruled evidence of the Milton assault admissible. It explained that "there are sufficient similarities between this occurrence and the killing of Ricky McDonald so as to permit the admission of the evidence pursuant to Evidence Code section 1101(b). [¶] As to the element of intent and/or mental state, the court is further and separately of the view that the evidence regarding the Milton incident is relevant and admissible as demonstrating a continuing course of conduct . . . . It does survive a 352 analysis and it is admissible." Later, the court reaffirmed its ruling that evidence of the Milton assault was "admissible under Evidence Code section 1101(b) bearing upon the issues of intent and mental state."

At the conclusion of the evidence, the court ruled that the prosecution had still failed to prove that defendant formed an intent to rob McDonald before killing him. Consequently, the court denied the prosecutor's request to instruct the jury

17

on a felony-murder theory.[17]  However, the court stressed "[t]hat is not to suggest that counsel are precluded from arguing the evidence of taking as being probative of [defendant's] state of mind or intent."

In charging the jury, the court gave this limiting instruction.  "Evidence has been introduced for the purpose of showing that the defendant engaged in conduct, more particularly the liquor store incident, other than that for which he is on trial.  This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes.  It may be considered by you only for the limited purpose of determining if it tends to show the intent and/or mental state which is a necessary element of the crime of murder of Ricky McDonald as charged in Count 1 of the information.  For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.  You are not permitted to consider this evidence for any other purpose."

### b. Analysis

" 'Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes.  (Evid. Code, § 1101.)  Evidence of uncharged crimes is admissible to prove identity, common

---

[17]     Defendant claims that the trial court prejudicially erred in admitting the testimony of McDonald's fiancée that he customarily left his pay under the mattress for her if she was not at home when he arrived.  This point is moot in light of the fact that the court did not allow the prosecution's felony-murder theory to reach the jury.

design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent.  [Citation.]'  (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)"  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*).)[18]

"As we stated in *Kipp*, 'There is an additional requirement for the admissibility of evidence of uncharged crimes:  The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.  (*People* v. *Ewoldt, supra,* 7 Cal.4th 380, 404–405.)  On appeal, a trial court's resolution of these issues is reviewed for abuse of discretion.  (*Id.* at p. 405.)  A court abuses its discretion when its ruling "falls outside the bounds of reason."  (*People* v. *De Santis* (1992) 2 Cal.4th 1198, 1226.)'  (*People v. Kipp*, *supra*, 18 Cal.4th 349, 371.)"  (*People v. Carter* (2005) 36 Cal.4th 1114, 1149; accord, *Foster*, *supra*, 50 Cal.4th at pp. 1328-1329; see Evid. Code, § 352.[19])

---

[18]     Evidence Code section 1101 provides:  "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

[19]     Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the

*(footnote continued on next page)*

The least degree of similarity is required to prove intent or mental state. A higher degree is required to prove common plan, and the highest degree to prove identity. (*People v. Lynch* (2010) 50 Cal.4th 693, 736; *Soper, supra*, 45 Cal.4th at p. 776; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.)

" 'Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. "In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it." [Citation.]' (*People v. Ewoldt, supra, ante,* p. 394, fn. 2, italics in original.)" (*People v. Balcom* (1994) 7 Cal.4th 414, 422.)

In his jury argument, defense counsel conceded that defendant assaulted McDonald. He contested two points. First, he asserted that Cooksey, not defendant, inflicted the fatal blows. Second, he claimed that defendant did not possess the intent required for first or second degree murder.

Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially. (*People v. Smith* (2005) 37 Cal.4th 733, 741; *People v. Beeman* (1984) 35 Cal.3d 547, 558-559.) Consequently, a defendant's actions leading up to the crime may be relevant to prove his or her mental state and intentions at the time of the crime. (See *People v. Avila* (2009) 46 Cal.4th 680, 701; *Smith*, at p. 741.)

" ' "We have long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' [citations], and

---

*(footnote continued from previous page)*

probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

20

that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." '(*People v. Gallego* (1990) 52 Cal.3d 115, 171.)" (*People v. Roldan* (2005) 35 Cal.4th 646, 706.)

Defendant claims that his conduct in the Milton and McDonald incidents was not sufficiently similar to support an inference as to his intent. We need not resolve the question. Any error in allowing the jury to consider evidence of defendant's attack upon Milton was harmless. It is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the alleged error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)[20] Defendant's claim that the Milton evidence "tipped the scales against [him] on the issue of whether the homicide was second degree murder or manslaughter" is not compelling given the lack of strong provocation by McDonald and the viciousness of the attack upon him by defendant and Cooksey. Therefore, the asserted error, contrary to defendant's claims, was not of such gravity as to amount to a denial of his "due process right to a fair trial, an impartial jury, and a reliable penalty determination guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and by Article One of the California Constitution."

---

[20]    In *People v. Malone* (1988) 47 Cal.3d 1, 22, we held the *Watson* test applicable to alleged errors in the admission of other-crimes evidence.

### 3. Reasonable Doubt Instructions

Defendant claims the standard reasonable doubt instruction given here over his objection was defective because it failed to inform the jury that every element of the charged crimes and special circumstances had be proven beyond a reasonable doubt.[21]  The claim lacks merit.  A single jury instruction may not be judged in isolation, but must be viewed in the context of all instructions given.  (*Middleton v. McNeil* (2004) 541 U.S. 433, 437; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 182; *People v. Huggins* (2006) 38 Cal.4th 175, 192.)  The alleged deficiency in the standard instruction given here was supplied by other instructions, which did expressly inform the jury that every element of the charged crimes and special circumstances had to be proven beyond a reasonable doubt.[22]

### B.  Penalty Phase Issues

### 1. Excusal of Prospective Juror for Cause

Defendant contends the for-cause excusal of Prospective Juror L.G. was error.[23]  The claim fails.

Under *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*), we consider whether the record fairly supports the trial court's determination that L.G.'s views on the death penalty would have prevented or substantially impaired her performance as a juror.  (*People v. Bramit* (2009) 46 Cal.4th 1221, 1233 (*Bramit*);

---

[21]   The general reasonable doubt instruction given here was based on CALJIC No. 2.90, and provided in pertinent part:  "The defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  *This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.*"  (Italics added.)

[22]   CALJIC Nos. 8.10, 8.66, 8.81.3, 8.81.15, and 8.81.21.

[23]   He contends it violated his rights to due process, a fair trial, an impartial jury, and a reliable penalty determination, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

*People v. Bunyard* (2009) 45 Cal.4th 836, 845 (*Bunyard*); *People v. Roldan, supra,* 35 Cal.4th 646, 696.)  We conclude it does.

L.G.'s responses on the juror questionnaire unequivocally satisfied the *Witt* standard.   Asked whether she would like to be a juror in this case, L.G. checked "No," explaining that, "I do not believe in the death penalty."  Asked whether she had any biases, prejudices, or preconceived notions that might affect the way she decided this case, L. G. checked "Yes," explaining that she was "Against death penalty."

Asked specifically what her feelings were regarding the death penalty, L.G. wrote, "Against!"  Asked to rate her attitude towards the death penalty, L. G. checked "Strongly oppose."  Asked in what types of cases, if any, she felt the death penalty should be available, L.G. wrote "N/A."

Asked whether her moral, religious, or philosophical beliefs in opposition to the death penalty were so strong that she would be unable to impose the death penalty, regardless of the facts, L.G. checked "Yes."  Asked whether her opposition to the death penalty would so substantially impair her ability to do her duty as a juror that she would only vote for life in prison without possibility of parole, L.G. checked "Yes."  Asked whether she would automatically vote for life in prison without possibility of parole, no matter what evidence was presented at trial, she checked "Yes."  Asked whether she would listen to and consider all the evidence presented by both the People and the defense before reaching a penalty decision, she checked "No."  Asked whether there was any reason she would not be a fair and impartial juror in this case, L.G. checked "Yes," giving "prejudice and against death penalty" as the reason.

Against this record, defendant contends that, "when questioned in open court, [L.G.] revealed that her opposition to the death penalty was not nearly as absolute as one might have gathered from reading her questionnaire."

23

" 'Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal, for "appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." [Citation.]' (*People v. Avila* (2006) 38 Cal.4th 491, 529.)

"A finding of bias 'may be upheld even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." [*Wainwright v. Witt, supra,* 469 U.S. at pp. 424-425. Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, is entitled to resolve it in favor of the State." *Id.*, at 434.' (*Uttecht v. Brown* (2007) 551 U.S. 1, 7; see *People v. Wilson* (2008) 44 Cal.4th 758, 779 (*Wilson*).)" (*Bramit*, *supra*, 46 Cal.4th at p. 1235.)

To the extent that the colloquies defendant relies upon created any ambiguity, the court was clearly entitled to resolve it in favor of excusal. The court asked L.G. whether she would provide for the death penalty if she were creating a system of law. L.G. responded that she probably would. Her full response offers defendant little support. In the same breath, L.G. said that in her legal system convicted felons would be quarantined, "maybe up into space or something."

The court pursued the matter, explaining that it was trying to determine "whether you truly can approach this case with an open mind as a juror or, if you'll forgive me, whether you're telling me or us what you think we ought to

24

hear." L.G.'s response was opaque. "Well, I'm a truthful person and I'm going to give my honest opinion. I mean as a juror I'm just going to be openminded. And if those in this case are the two options, then it would have to depend on the outcome of us as jurors for whomever to be able, for me to really indicate death or life. *So I couldn't be open if I was picked*." (Italics added.)

Defendant asserts that L.G. later stated that she could change her mind. However, it is not clear that she was speaking about the death penalty. Her statement came in response to the court's follow-up questions regarding her answers to items on the questionnaire dealing with race. Question No. 106 asked whether the race of the defendants and the victims would affect her decisionmaking. L.G. did not answer the question. Instead, she wrote "Private." Question No. 107 asked whether the fact that defendant and his accomplice Nicole Halstead were "involved in an intimate interracial relationship" would affect her ability to sit as a fair and impartial juror. L.G. checked "Yes." In the space provided for an explanation she wrote "Prejudice." The court asked L.G. to "[l]ook at questions 106 and 107 . . . and talk to us about your answers to those questions, please." L.G. said, "Okay. There again, I put private because it's hard for me to know how I feel. I mean as an overall, I really don't believe in the death penalty. But then again, upon hearing facts and really going into detail, there's something that could change my mind." Her answer was not responsive. It did not clarify her answers to item Nos. 106 and 107 on the questionnaire. It is unclear whether L.G. wished to discuss her answers in private, whether she considered her views private, or whether she was attempting to convey some other unclarified meaning.

Later on voir dire, the court asked L.G., "do the convictions themselves close your mind or make the decision for you as to what sentence should be imposed?" L.G. responded, "No. The only thing I have to say on that is that a life

25

imprisonment sentence is a way to make a person that's guilty suffer longer, but that's just before knowing the circumstances leading up to this." The court followed up by asking L.G. if she felt that death was the "just and appropriate result" after she deliberated, could she "support that verdict and announce it publicly here in the courtroom?" Her answer was again opaque. "Truthfully, with all the circumstances and if it led up to that, where knowing all the facts, if all the facts were there, it's hard for me to make that decision right now because I'm not there."

Defendant complains that the court's question was misconceived. He argues that, "[a]t the end of a penalty trial, jurors are not required to stand up, look at the defendant, and say 'I sentence you to death.' " However, that was not what the court was asking. "The predicate of the question was sound. Jurors must be prepared to affirm their verdicts.[24]" (*Bramit*, *supra*, 46 Cal.4th at p. 1235.)

Defendant next contends "the trial court never asked [L.G.] the fundamental question that is at the heart of [*Witt*] death qualification of jurors, namely 'whether a prospective juror's "views on capital punishment . . . would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " ' (*People v. Stewart* [(2004)] 33 Cal.4th [425], 441, fn. 3.)" The defense never requested such a question. Further, the court's failure to ask that question in so many words was not error. (*People v. Salcido* (2008) 44 Cal.4th 93, 134.) The record reflects a focused inquiry on the topic. In light of the questionnaire and the inquiries made by the court during voir

---

**24** "Penal Code section 1149 provides: 'When the jury appear they must be asked by the Court, or Clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same.' "

dire, it was quite clear that the court discharged its responsibilities and that L.G. was impaired under the *Witt* standard.  (*Ibid.*)

Defendant contends that questions "remarkably similar" to those asked here were found to be "insufficient to meet the [*Witt*] standard for disqualification" in *People v. Stewart*, *supra*, 33 Cal.4th 425.  Defendant's reliance on *Stewart* is misplaced.  "In *Stewart*, the court excused five prospective jurors solely on the basis of their answers on a written questionnaire.  The court largely relied on the jurors' responses to the question whether their views would ' "prevent or *make it very difficult* … [¶] … [¶] … [t]o ever vote to impose the death penalty." ' (*Id.* at pp. 442–443, italics added.)  We concluded that the court erred in excusing the prospective jurors on this basis because the questionnaire answers provided insufficient information about the jurors' states of mind.  (*Id.* at pp. 446–452.)  As *Stewart* explains, 'the circumstance that a juror's conscientious opinions or beliefs concerning the death penalty would make it very difficult for the juror ever to impose the death penalty is not equivalent to a determination that such beliefs will "substantially impair the performance of his [or her] duties as a juror" under *Witt*, *supra*, 469 U.S. 412.' (*Stewart*, *supra*, at p. 447; see also *People v. Avila, supra,* 38 Cal.4th 491, 530 ['mere *difficulty* in imposing the death penalty does not, per se, prevent or substantially impair the performance of a juror's duties'].)  This is so because individuals who firmly oppose the death penalty ' "may nevertheless serve as jurors in capital cases so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of  law." ' (*Stewart*, *supra*, at p. 446, quoting *Lockhart v. McCree* (1986) 476 U.S. 162, 176.)" (*People v. Solomon* (2010) 49 Cal.4th 792, 832-833.)  Unlike *Stewart*, the trial court here thoroughly questioned L.G., both in writing and in person, to determine whether her views regarding the death penalty would substantially impair the performance of her duties as a juror.

Defendant's final argument is that the trial court erred because it failed to expressly find that L.G.'s views on the death penalty would substantially impair the performance of her duties as a juror. It is true that the court failed to couch its finding in the *Witt* formula. However, the gravamen of the court's finding was clearly that L.G. was impaired under the *Witt* standard. The prosecutor challenged L.G. for cause, arguing that "as many times as the court tried to get her to commit to whether or not she could, in fact, vote for either option, she just simply would not answer the question." The court granted the motion, saying "I am satisfied that the challenge for cause ought to be sustained, that [L.G.] exhibits a very strong implied, if not actual, bias against the death penalty based upon her questions in open court and mindful of her written answers to the questionnaire inquiries." The defense did not object to the reasons the court gave. *Witt* has long been the law and it is clear the court was aware of the appropriate standard to apply. In the absence of evidence to the contrary, we presume that the court "knows and applies the correct statutory and case law." (*People v. Coddington* (2000) 23 Cal.4th 529, 623, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see Evid. Code, § 664; *People v. Visciotti* (1992) 2 Cal.4th 1, 49; *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913.)

### 2. *Instruction That Death Is the Greater Penalty*

Defendant contends the trial court prejudicially erred in instructing the jury that death is a greater punishment than life imprisonment without possibility of parole. The claim fails.

During the first penalty trial, the prosecutor requested this instruction. Invited to comment, defense counsel raised no objection. As noted, the first penalty trial resulted in a mistrial. At the penalty phase retrial defendant did not

object to the instruction of which he now complains. The court instructed the jury that, "[f]or all purposes, you must consider and accept that death is a greater penalty than life imprisonment without possibility of parole."

"Section 1259 permits appellate review of claimed errors to the extent they 'affected the substantial rights of the defendant.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 375, fn. 13 (*Gamache*).) Under California law, death is a greater punishment than life imprisonment without possibility of parole. The instruction was proper. Thus, giving it did not adversely affect defendant's substantial rights.

Defendant contends that such an instruction is prejudicially erroneous because it "enjoins a juror who believes that life without parole is a 'greater' punishment than death from adhering to that view in deciding what the appropriate sentence in a capital case should be." He asserts that "[t]here is no California statute nor court decision, state or federal, that specifies that death is a 'greater' punishment than [life without the possibility of parole] . . . ." To the contrary, "[i]n *People v. Harris* (2005) 37 Cal.4th 310, we upheld, as within the trial court's discretion, its decision to instruct, pursuant to a jury request, that death is the more severe penalty. This instruction was clearly a *correct* statement of the law, we explained, because the principle '[t]hat death is considered to be a more severe punishment than life [without parole] *is explicit in California law*: CALJIC No. 8.88 . . . states in pertinent part, "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." ' (*Harris*, *supra*, at p. 361, italics added.)" (*People v. Tate* (2010) 49 Cal.4th 635, 707.)

### 3. *Sufficiency of Aggravating Evidence*

The prosecution presented aggravating evidence that defendant committed the crime of grossly negligent discharge of a firearm in violation of section 246.3, subdivision (a).  (See pt. I.B.1.b.ii, *ante*.)  The jury was instructed, "concerning the shooting in the area of Jesse Russell's residence on September 17, 1995, you are limited to a consideration of the possible or potential offense of grossly negligent discharge of a firearm.  Every person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a crime."

Defendant contends "there simply was no evidence that [he] was the person who fired the gun."  To the contrary, the evidence was ample.  Nicole Halstead, defendant's girlfriend, complained to him that Russell had forced his way into her apartment, ransacked it, and choked her.  Defendant left her apartment, saying he was "tired" of Russell and that he was "going over there."  Later, defendant tapped on Russell's window and asked for him.  When Russell's brother DeMarco Atkins said Russell was not there, defendant replied that he was looking for him and was going to "get him."  Atkins heard a gun being cocked and, minutes later, shots fired.  Ballistics evidence strongly supported the conclusion that defendant fired those shots.  Beyond timing and motive, the cartridge casings found near Russell's home were fired by the gun that defendant used in the home invasion robbery later that same night.  (See pts. I.B.1.ii. & iii., *ante*.)

Defendant further contends that a grossly negligent shooting is not criminal activity involving force or violence directed at a person, and so is not admissible as aggravating evidence.  The argument fails.  In considering a capital defendant's punishment, the jury is permitted to consider the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."  (§ 190.3,

30

factor (b).)  The requisite "criminal activity" must violate a penal statute and "the use or attempted use of force or violence or the express or implied threat to use force or violence" must be directed at a person.  (*People v. Clair* (1992) 2 Cal.4th 629, 672; *People v. Boyd* (1985) 38 Cal.3d 762, 772, 776.)  "In the administration of the penalty provisions of Penal Code section 190.3, however, we have often said that the analysis is not one that is made on the basis of the abstract, *definitional* nature of the offense[.]"  (*People v. Padilla* (1995) 11 Cal.4th 891, 963.)  Rather, it is based on the *conduct* of the defendant which gave rise to the offense.  (*Ibid.*; *People v. Fierro* (1991) 1 Cal.4th 173, 231.)  For example, in *Padilla*, the defendant committed the crime of being an ex-felon in possession of a firearm.  On one occasion he used the gun to shoot his daughter; on another he pointed the gun at police officers.  "Because both of these incidents plainly involved *actual* force or violence, as prescribed by section 190.3 of the Penal Code," we upheld the trial court's instruction that the crime of being an ex-felon in possession of a firearm in this instance " 'involved the express or implied use of force or violence or the threat of force or violence.' " (*Padilla*, *supra*, at pp. 962, 963.)  Similarly, the evidence introduced in this case plainly showed that defendant intended his crime of grossly negligent shooting to serve as an "express or implied threat to use force or violence" against Jesse Russell.

Finally, defendant contends there was no evidence the shots were fired in a "grossly negligent manner which could result in death or injury to a person," as required by section 246.3, subdivision (a).[25]  To the contrary, "[t]he phenomenon

---

[25]    Section 246.3, subdivision (a) provides:  "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment in the state prison."

31

that gave rise to the statute was celebratory gunfire in an urban setting. It seems clear that the Legislature intended to proscribe such grossly negligent conduct precisely because it could cause injury or death. Given this reality, it is equally clear that the Legislature did *not* intend to require proof that a given person was actually so endangered. Imposing such a burden on the prosecution would render the statute largely unenforceable in the very circumstances that prompted its enactment. No one knows where shots fired recklessly into the air are likely to land." (*People v. Ramirez* (2009) 45 Cal.4th 980, 990 (*Ramirez*).) Moreover, firing the shots near Russell's house, in a residential neighborhood and after making a threat against him, " 'presented the very real possibility that it would generate responsive gunfire.' " (*Id*. at p. 989, quoting *People v. Alonzo* (1993) 13 Cal.App.4th 535, 540.)[26]

### 4. *Future Dangerousness*

Defendant contends the trial court erred in permitting the prosecutor to argue, based on the evidence of defendant's other violent offenses, that he would pose a danger in the future if his life were spared. The claim fails.

Prosecutorial argument regarding a capital defendant's future dangerousness is permissible if, as here, it is based on evidence of the defendant's conduct rather than expert opinion. (*People v. Williams* (2010) 49 Cal.4th 405, 463, fn. 7; *People v. Ervine* (2009) 47 Cal.4th 745, 797; *Bramit*, *supra*, 46 Cal.4th at p. 1244.) Notwithstanding defendant's argument to the contrary, the violent conduct need not have occurred in a prison setting. (*People v. Bradford* (1997)

---

[26]    Defendant asserts there is no evidence that defendant violated section 246, which requires that an inhabited dwelling or other specified object be within the defendant's firing range. (See *Ramirez*, *supra*, 45 Cal.4th at p. 990.) The point is irrelevant. The jury was not instructed on section 246.

15 Cal.4th 1229, 1380; *People v. Taylor* (1990) 52 Cal.3d 719, 750.) We have previously rejected defendant's argument that because future dangerousness is not a listed aggravating factor, a prosecutor can argue that point only to rebut defense argument or evidence. (*People v. Michaels* (2002) 28 Cal.4th 486, 540-541.) Finally, defendant contends that permitting the jury to consider future dangerousness denied him his right to due process of law and a reliable penalty determination guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. We have previously rejected this claim and do so again. (*People v. Boyette* (2002) 29 Cal.4th 381, 446, citing *Barefoot v. Estelle* (1983) 463 U.S. 880, 896-903.) Defendant's argument for reconsidering the question is murky, but he appears to claim that the jury's penalty determination was not constitutionally reliable because it was not required to make a unanimous finding on the question of future dangerousness. Future dangerousness is not a statutory aggravating factor. (§ 190.3; *People v. Davenport* (1995) 11 Cal.4th 1171, 1223.) Even if it were, nothing in the federal Constitution requires a penalty phase jury to make written findings of the factors it finds in aggravation and mitigation, nor to agree unanimously that a particular aggravating circumstance exists. (*People v. Burney* (2009) 47 Cal.4th 203, 267-268; *People v. Williams* (2008) 43 Cal.4th 584, 648.)

### 5. *Challenges to the Death Penalty Law and Instructions*

Defendant raises a series of challenges to California's death penalty law and the standard CALJIC sentencing instructions. We have rejected each of these challenges in the past and now reaffirm our holdings.

California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty. (*Gamache*, *supra*, 48 Cal.4th at p. 406; *People v. Barnwell* (2007) 41 Cal.4th

33

1038, 1058 (*Barnwell*).) Specifically, the felony-murder special circumstance (§ 190.2, subd. (a)(17)) is not overbroad and adequately narrows the pool of those eligible for death. (*Gamache*, *supra*, 48 Cal.4th at p. 406; *People v. Kraft* (2000) 23 Cal.4th 978, 1078.)

Section 190.3, factor (a), which permits the jury to consider "the circumstances of the crime" in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975-976; *People v. D'Arcy* (2010) 48 Cal.4th 257, 308 (*D'Arcy*); *People v. Cruz* (2008) 44 Cal.4th 636, 680 (*Cruz*).)

Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty. (*People v. Burney*, *supra*, 47 Cal.4th at pp. 267-268; *People v. Williams, supra,* 43 Cal.4th at pp. 648-649.) This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296. (*D'Arcy*, *supra*, 48 Cal.4th at p. 308; *People v. Carrington* (2009) 47 Cal.4th 145, 200; *People v. Mendoza* (2007) 42 Cal.4th 686, 707.)

Review for intercase proportionality is not constitutionally compelled. (*Pulley v. Harris* (1984) 465 U.S. 37, 42, 50-51; *Bramit*, *supra*, 46 Cal.4th at p. 1250; *People v. Butler* (2009) 46 Cal.4th 847, 885 (*Butler*).)

The jury may properly consider unadjudicated criminal activity at the penalty phase and need not make a unanimous finding on each instance of such activity. (*D'Arcy*, *supra*, 48 Cal.4th at p. 308; *People v. Elliot* (2005) 37 Cal.4th

34

453, 488; *People v. Morrison* (2004) 34 Cal.4th 698, 729.) *Apprendi* and its progeny do not compel a different result. (*D'Arcy* at p. 308; *Bunyard*, *supra*, 45 Cal.4th at p. 861; *People v. Ward* (2005) 36 Cal.4th 186, 221-222.)

The use in the sentencing factors of the phrases "*extreme* mental or emotional disturbance" (§ 190.3, factor (d), italics added) and "*extreme* duress or . . . *substantial* domination of another" (*id.*, factor (g), italics added) does not inhibit the consideration of mitigating evidence or make the factors impermissibly vague. (*Bramit*, *supra*, 46 Cal.4th at p. 1249; *Bunyard, supra,* 45 Cal.4th at p. 861; *People v. Lewis* (2008) 43 Cal.4th 415, 532.)

The trial court need not label the statutory sentencing factors as either aggravating or mitigating, nor instruct the jury that the absence of mitigating factors does not constitute aggravation. (*D'Arcy*, *supra*, 48 Cal.4th at p. 308; *People v. Watson* (2008) 43 Cal.4th 652, 704; *People v. Cunningham* (2001) 25 Cal.4th 926, 1041.)

Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. (*People v. Jennings* (2010) 50 Cal.4th 616, 690; *Cruz*, *supra*, 44 Cal.4th at p. 681; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242-1243.)

The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties. (*People v. Mills* (2010) 48 Cal.4th 158, 215; *Butler*, *supra*, 46 Cal.4th at p. 885; *Barnwell*, *supra*, 41 Cal.4th at p. 1059.)

## III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**JENKINS, J. \***

_____
\*      Associate Justice, Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Thomas

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S082828
**Date Filed:** July 28, 2011

_____

**Court:** Superior
**County:** San Diego
**Judge:** Allan J. Preckel


_____

**Counsel:**

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Annie F. Fraser and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Barry L. Morris
1260 B Street, Suite 240
Hayward, CA  94541
(510) 247-1100

Christopher P. Beesley
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2567