Filed 1/18/22

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | H048761 (Santa Clara County Super. Ct. No. 118JD025484) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. E.C., Defendant and Appellant. | |


On November 21, 2018, the Santa Clara County Department of Family and Children's Services (Department) filed a petition under Welfare and Institutions Code section 300[1] relative to a girl, A.L. (the minor), who was then three years old. A.C. (mother) and E.C. (father) are the minor's parents. The minor was living with father, and she was placed into protective custody after father left the minor with a daycare provider for several days without making arrangements for the minor's care. Father was in custody, and the Department at the time could not locate mother. On March 12, 2019, the

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

juvenile court declared the minor a dependent child, removed her from father's care, and ordered that father receive family reunification services.

Father received services for 16 months. On July 23, 2020, the juvenile court terminated father's services and scheduled a selection and implementation hearing pursuant to section 366.26 (366.26 hearing). Father thereafter filed a petition under section 388 (388 petition) seeking the return of the minor to his care. On January 13, 2021, after a combined hearing on father's 388 petition and selection and implementation, the court denied the petition, found the minor adoptable, and terminated father's parental rights.

Father filed an appeal from the order denying the 388 petition and the order terminating parental rights after the 366.26 hearing. With respect to the 366.26 order, he argues that the juvenile court abused its discretion in denying his claim of the beneficial parental relationship exception to adoption (hereafter, the parental-benefit exception). He asserts that the court did not apply the correct legal standard by basing its determination that the exception did not apply on the finding that father did not occupy a strong parental role in the minor's life. Father argues that, as clarified by the California Supreme Court in *In re Caden C*. (2021) 11 Cal.5th 614 (*Caden C.*), a case filed after the 366.26 hearing below, a parent seeking to apply the parental-benefit exception need not show that he or she occupies a parental role in the child's life.

Finding no error, we will affirm the juvenile court's order denying father's 388 petition and the order after the 366.26 hearing.

## I.     FACTS AND PROCEDURAL HISTORY[2]

### A.     Initial Proceedings (November 2018)

On November 21, 2018, the Department filed a petition under section 300, subdivisions (b) (1), (g), and (j) relative to the minor.  The Department alleged that on November 9, 2018, the minor was placed into protective custody because father had left the minor with a daycare provider, M.C., without providing for the minor's care.  Father was in custody at Elmwood Correctional Facility (Elmwood).  Despite the Department's diligent efforts, the whereabouts of mother remained unknown.

The Department alleged that mother had an extensive and active substance abuse problem that impaired her ability to care for her children.  She also had a history of domestic violence.  Mother had two children in addition to the minor who were not in her care because of her inability to meet their basic needs.  In August 2017, the juvenile court had declared her child, G.C.—then three months old—a dependent child.  Mother's reunification services were terminated in March 2018 and her parental rights as to G.C. were terminated in July 2018.

The court ordered the minor detained on November 26, 2018.

In a second amended petition filed in March 2019, the Department alleged that father had an extensive and active substance abuse issue that impaired his ability to care for the minor, and that he had been using methamphetamine and alcohol over the previous five years.  Father had tested positive for methamphetamines on February 1, 2019.  The Department alleged that father "ha[d] a history of perpetrating

---

[2] There was a prior related appeal filed by mother with this court in which we affirmed the juvenile court's order after jurisdiction/disposition hearing.  (See *In re A.L.* (Nov. 26, 2019, H046887) [nonpub. opn.] (*In re A.L. I*).)  This court deemed father's motion herein "to correct the record" a request for judicial notice and granted judicial notice of the record filed in *In re A.L. I*.  (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).)  The procedural history and factual background recited here up through the jurisdictional/dispositional hearing are taken from our opinion in *In re A.L. I*.

severe physical domestic violence on the mother in the presence of the [minor, and he] was arrested and charged with perpetrating domestic violence on the mother" on four occasions between December 2015 and July 2016. Father was placed on probation but did not comply with drug treatment or domestic violence counseling.

## B. Jurisdiction/Disposition Hearing (March 2019)

### 1. Department's Reports

The Department reported that upon her detention on November 19, 2018, the minor was placed in an emergency foster home. On November 30, she was placed with M.C., the minor's daycare provider.

The minor's detention arose after it was reported on November 5 that father had dropped off the minor at M.C.'s home on November 1 and had not returned to pick her up for the next five days and had not contacted M.C. The Department made various efforts to locate father. It was not until November 20 that it located father, determining that he was incarcerated in Elmwood.

During an interview at the Elmwood facility on November 20, father explained to the social worker that he had been the sole provider for the minor her entire life, and that mother had left the minor in the sole care of father around the fall of 2017. Father told the social worker that he had no drug or alcohol issues. He said he was not in contact with mother and did not know where she lived. He stated that he had first used marijuana when he was 10 years old, but, as an adult, did not like to use it. He denied having a current alcohol problem. Father stated further that he had used cocaine from 2010 to 2013 at a frequency of four to five times per month. He began using methamphetamine in 2014, when his use was twice per day, until 2016. He stated he had ceased using it in September 2016 when he began receiving informal supervision services.

The daycare provider, M.C., advised that she had taken care of the minor for two years. Approximately three months before the minor was detained, father told M.C. that he needed to turn himself in to the authorities; he asked her if she would be the

4

minor's caregiver and she agreed. M.C. reported that in the month before he was arrested, father "appeared more unaware of his environment, reported he could not remember previous statements told to him, had poor hygiene, his eyes appeared red, and [he] did not turn in the child's physical and dental results to the school."

Father's cousin told the Department on December 11 that father had been struggling with alcohol abuse for three years. Father lived in his car with the minor and drank alcohol daily in public in her presence. The cousin understood that father had never received substance abuse treatment. The cousin also understood that father and mother had originally met at a tire shop where father worked, and they had used methamphetamine and drunk alcohol together. The cousin believed that mother and father exposed the minor to their substance abuse throughout the time that parents lived together.

Father was convicted in February 2016 of battery upon a spouse or cohabitant (Pen. Code, §§ 242, 243, subd. (e)) and possession of a deadly weapon with intent to commit assault (*id.*, § 17500), for which he received three-years' probation. Father's probation officer reported that father had violated the terms of his probation on three occasions, and that he would be unsuccessfully released from probation in January 2019. The probation officer advised that father had failed to comply with the terms of his probation of drug testing and domestic violence counseling.

On January 7, 2019, father advised the Department that he expected to be released from Elmwood on January 17. He told the social worker he would contact her upon his release to schedule a meeting and supervised visits. Father was in fact released on January 17, but he waited 11 days to contact the Department.

The Department concluded that the minor could not be safely placed with father because (1) he had been released from custody on January 17 and did not contact the Department until 11 days later; (2) his whereabouts remained unknown; (3) his instability did not allow for him to safely care for the minor; (4) he had untreated substance abuse

5

issues and a domestic violence issue, and he had not been forthcoming with the Department about them; and (5) he lacked insight into the issues that resulted in the minor's being detained.

### 2. *Jurisdiction and Disposition Hearing*

The juvenile court conducted a combined jurisdiction and disposition hearing on March 12, 2019. The court found the allegations of the second amended petition true, and it adjudicated the minor a dependent child of the court. It found by clear and convincing evidence that the minor's welfare required that the minor be removed from the physical custody of father, and that placement with mother (the previously non-custodial parent) would be detrimental to the child's safety. It ordered reunification services for father, and it ordered services for mother bypassed (§ 361.5(b)(10), and (11).

Mother appealed the jurisdiction and disposition order. We affirmed the order on November 26, 2019 in *In re A.L. I* filed.

### C. Change in Placement (May 2019)

The Department filed a supplemental petition under section 387, seeking a change of custody of the minor from M.C. to a new foster care provider, based upon M.C.'s having left the country in April 2019 without an appropriate caregiver for A.L. and because of two child welfare referrals involving suspected physical abuse of the child. On May 21, the minor was placed by the Department in a Resource Family Approved (RFA) home in Santa Clara County. The juvenile court sustained the allegations of the petition on May 29, 2019.

### D. Six-Month Review Hearing (September 2019)

In September 2019, the Department reported that father consistently attended supervised visits with the minor two hours per visit, twice per week. Father was appropriate during the visits, and he arrived with food and toys for the child. The minor had expressed that she loved father and that she enjoyed their visits.

6

Father was employed fulltime, and "continue[d] to be homeless" sleeping in his recreational vehicle. The Department stated that father "continue[d] to show minimal participation in his Court-ordered case plan services as he only recently [had become] engaged in al his services." The social worker, however, stated that she had no doubt that father loved the minor and was attempting to reunify with her. Father had been participating in drug testing since February 2019; he had tested positive for methamphetamines/amphetamines on three occasions (June 14, June 25, August 2).

The Department reported further that the minor had made a good adjustment with her new caregivers, and she appeared to be comfortable and happy in the new home. The caregivers had indicated they were willing to adopt the minor.

On September 3, 2019, the court ordered that father continue to receive reunification services. Three weeks later, the juvenile court made a finding that E.C. was the biological father of the minor.[3]

**E.     Twelve-Month Review Hearing (January 2020)**

The Department reported in January 2020 that the minor continued to reside and do well in the care of the RFA home in which she had been placed on May 21, 2019. The minor had her own bedroom, and she was very close to the caregiver's goddaughter, who visited frequently. The minor had advised the social worker that "she [felt] 'happy' living there."

Father, who had been renting a bedroom, had moved into his own studio apartment in November 2019. He continued to participate in twice-weekly supervised visits with the minor that had gone well. The Department was projecting that "stepped down" unsupervised visitation would commence in mid-February 2020.

---

[3] On July 21, 2020, the court declared E.C. the presumed father pursuant to section 7611, subdivision (d).

The Department stated Father's participation in services had improved since the prior reporting period. Father had relapsed in October 2019—testing positive on October 10 for methamphetamines/amphetamines—and he admitted in a December Child Family Team meeting that his participation in Narcotics Anonymous (NA)/Alcoholics Anonymous (AA) meetings had been irregular, but he intended to increase that participation. The Department advised that father's "progress in alleviating his substance use [had] been slow."

On January 17, 2020, the juvenile court ordered that father continue to receive reunification services. The court also made a finding that E.C. was the minor's natural father and granted his de facto parent motion.

## F.     Eighteen-Month Review Hearing (July 2020)

The Department reported that the minor "continue[d] to thrive under the[] care" of the concurrent foster family where she had been placed in May 2019. She was closely bonded with the foster family. The minor had told social worker Diana Barrientos that she loved her caregivers, and she didn't want to be moved. The minor called them " 'mommy,' 'mom,' 'dad,' and 'daddy.' " In February, the foster family had undertaken the custody of a safely-surrendered newborn baby; the minor was enjoying her new role as a big sister and was "closely attached" to her.

Father was residing with his adult nephew. He returned to work in May 2020 after a two-month hiatus because of shelter-in-place orders necessitated by the COVID-19 pandemic.

Since the last reporting period—due to father's having relapsed, thus resulting in a continued safety risk to the child—the stepped-down visitation that had been previously projected was not implemented. Supervised weekday visits were moved to four-hour Saturday sessions because long schooldays left the minor too tired and irritable for evening visits. Father's last in-person visit was on March 14. Thereafter, due to the COVID-19 pandemic, he participated in 15-minute supervised Zoom telephone calls with

the minor three times per week.  He attended all such visits and was appropriate during the calls.

The Department advised that since the last reporting period, father had "disengaged from participating in his Court-ordered case plan services" and had "continued to struggle with his substance use of methamphetamines and amphetamines." Father had 22 missed drug test calls and three drug tests, which he made up within a week of their scheduled dates.  On February 3, February 20, and March 5, 2020, he had tested positive for methamphetamines/amphetamines, and he had abnormal (dilute) drug test results on March 9.  Regular drug testing was suspended from mid-March until late June because of COVID-19 shelter-in-place orders.  In July, father continued to miss drug calls and scheduled drug tests.  On various occasions, father "continued to deny" his relapses and claimed there had been something wrong with the drug test samples.  During the reporting period, father had not "reconnect[ed] with Court-ordered case services that include[d] updating his SUTS assessment, attending regular AA/NA meetings weekly, participat[ing] in outpatient services and continu[ing] attending individual therapy."  The Department recommended that the court terminate father's services and schedule a 366.26 hearing.

The juvenile court conducted a contested 18-month review hearing on July 22 and 23, 2020.  After hearing evidence and argument, the court adopted the recommendations of the Department, terminated father's services, and scheduled a 366.26 hearing for November 6, 2020.

### G.     Request to Change Order

On November 10, 2020, father filed a 388 petition, which was later amended. Father requested that the court change its July 23, 2020 order terminating services and setting a 366.26 hearing.  He requested that the minor be returned to his custody under a family maintenance plan.  Father alleged that he and the minor were very bonded to each other; father had been clean and sober since March 6, 2020; he had been regularly

9

attending 12-Step meetings; he had completed a 52-week certified batterer's program; he had rented a room from his nephew that was a suitable home for the minor; he was fully employed; he had regularly visited the minor; and after one such visit, the caregiver had sent an e-mail transcribing a message from the minor to father stating " '[a]fter my visit today, I felt sad because I'm afraid I wouldn't be able to see you. I wish I could see you every day. . . .' "

The Department submitted a report in which it opposed father's 388 petition.

The court set a contested hearing on father's 388 petition, as amended. The contested hearing took place on January 13, 2021.

### H.    Report for Section 366.26 Hearing

The Department reported that during the reporting period, "[father had] started calling the drug testing line, Monday through Friday, to conduct random drug testing, twice a week." Father had not missed any phone calls or tests, and he had received normal test results for the five tests reported (from December 21, 2020 to January 4, 2021). Father continued to participate in regular supervised visits with the minor, either in-person, or (due to the COVID-19 pandemic) through video calls. During the visits, the minor tended to be relatively quiet but listened to what father told her.

Since the last reporting period, the Department reported that the minor "continue[d] to appear more and more attached to her current caregivers." Social worker Barrientos observed that during in-person visits and video calls, the minor was strongly attached to her caregivers, and the child continued to seek the caregivers' comfort and affection during times of sadness or distress. The Department advised that the minor's needs continued to be met by her caregivers. They took time off from work whenever the minor was ill, and they transported her to supervised visitation with her parents.

The Department's assessment was that father had struggled with his methamphetamine use throughout the dependency proceedings notwithstanding the 16 months of services the Department had provided. Father was making efforts to

10

address his issues, but it was too soon to determine the long-term prognosis in light of his chronic use of methamphetamine for at least seven years. The minor had been out of father's care for more than two years, and visits had remained supervised the entire time. The Department noted it was clear that the minor loved father and looked forward to their visits, but that the child did not appear negatively impacted on occasions when scheduled visits did not occur. In light of the close relationship the minor had with her caregivers and the stability they offered, the Department recommended that the juvenile court terminate the parental rights of father and mother and select adoption as the permanent plan.

## I.      Hearing on 388 Petition/Selection and Implementation (January 2021)

The juvenile court conducted hearings on father's 388 petition and on selection and implementation under section 366.26 on January 13, 2021. The court received into evidence three reports of the Department, i.e., the 366.26 hearing report, its response to father's 388 petition, and a January 13, 2021 addendum report.[4] The court also received into evidence certain documents offered by father, including drug testing and substance abuse program reports and meeting slips. Social worker Barrientos and father testified as witnesses at the joint hearing. The court, pursuant to the parties' stipulation, found social worker Barrientos qualified as an expert in the areas of risk assessment and permanency planning.

---

[4] A report by the Department in connection with the 366.26 hearing, dated November 17, 2020 (366.26 report), was not part of the appellate record. We have obtained a copy of that report from the superior court, and we will take judicial notice of the 366.26 report. (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).) Because the information contained in the 366.26 report is consistent with other matters in the record we have reviewed and considered, the judicially-noticed 366.26 report does not impact our analysis of the case.

11

### 1.    *Testimony of Social Worker Diana Barrientos*

Social worker Barrientos provided testimony concerning both father's 388 petition and selection and implementation.  She explained that she had been the assigned social worker on the case since November 2018.

Barrientos testified that one of the primary safety concerns resulting in the minor becoming a dependent child was father's substance abuse.  Throughout the dependency, father had periodically tested positive for methamphetamine and had several dilute tests.  She testified that father, "for the most part," was not open and honest about his substance use, and he would usually deny that he had used methamphetamine after positive tests.  As of the 18-month review hearing in July 2020, father had just begun participating in an outpatient substance abuse treatment program; he had previously completed an outpatient treatment program, but he had not maintained his sobriety and had been dishonest with service providers about his substance use during his attendance at that program.  Because by July 2020, father had not demonstrated an ability to maintain long-term sobriety, Barrientos had recommended termination of services.

Barrientos questioned father's representation in his amended 388 petition that he had been sober since March 6, 2020.  She testified that father had had a dilute (presumed positive) test on March 9; he had missed scheduled drug tests on July 6 and 7; he was no longer subject to testing through the Department after his services were terminated on July 22; his voluntary testing was not random testing; and he had had another dilute (presumed positive) test on November 18.[5]  Social worker Barrientos opined that father was still in the early stages of recovery.

---

[5] Barrientos acknowledged during cross-examination that father had received negative drug test results in 2020 on June 25 and 29, August 6, 13, 20, and 28, September 4, 11, and 21, October 7, 16, and 23, and December 8 and 17.

Father had been quite consistent with his visitation with the minor throughout the proceedings. Social worker Barrientos had supervised more than 10 visits. She observed that the visits were "very fun, friendly," with lots of activities, and they were enjoyable to the minor. Barrientos testified that father was very engaged and conversed throughout the visits, but the minor spoke "barely a handful of words during the supervised visits." During the supervised visits, Barrientos did not hear the minor refer to her father "as ['']dad, father. [']" The last visit Barrientos attended was a four-hour supervised visit on December 21, 2020, which was "a very fun, friendly visit" with father and the minor playing games together. She observed that the minor had no difficulty separating from father at the end of their visit. And she testified that when father had missed scheduled video visits, the minor had not been affected and had been easily redirected.

Barrientos opined that the fact that father had consistently tested negative for a few weeks prior to the combined January 2021 hearing did not change her assessment. She explained that father had a long history of methamphetamine use, and during his 18 months of services, he continued to use methamphetamine and denied such use.[6]

Barrientos concluded that it would not be safe to return the minor to father's care because of his ongoing substance abuse; the fact that he was still in the early stages of recovery; his recent dilute test; and a concern that because of his continued use of methamphetamine, he would neglect the minor's basic needs and not provide her with necessary care. She observed that father had never progressed beyond supervised visits; he had two monitored visits in January 2020, but he had regressed to supervised visits after another positive drug test.

---

[6] Although Barrientos testified that father received 18 months of services, the record shows that he in fact received 16 months of services (from March 2019 to July 2020).

Social worker Barrientos concluded further that, if the juvenile court were to find the existence of changed circumstances under father's 388 petition, it would not be in the minor's best interest to return her to father's care. This opinion was based upon Barrientos's concerns about the minor's safety due to father's substance abuse history, and the fact that returning the child to father's care "would just be a very abrupt, sudden change with the transition plan [with] an adoptive-ready home that is very committed to [the minor]," and with the minor and the caregivers being "very attached to one another."

Barrientos testified that the minor had been with the prospective adoptive family more than 19 months (since May 21, 2009), they were very attached to each other, and the family was very committed to the minor. The social worker had observed the minor refer to her foster parents as "[m]ommy, daddy, mom, dad." The minor considered herself the big sister of the other child in the caregivers' home.

With respect to issues for the 366.26 hearing, social worker Barrientos rendered the opinion that the minor was adoptable. She based this assessment upon, inter alia, the minor's young age, her being a bright and caring young girl, her having no developmental delays or medical or educational issues, and her being in a foster home that was very committed to adopting her.

In making her assessment for the 366.26 hearing, social worker Barrientos considered the nature of the bond that the minor had with father. Barrientos opined that father (1) was not involved in the minor's education, (2) did not help the minor with schoolwork, (3) was not involved in the minor's medical appointments and he never asked to be more involved with them, and (4) was not a parent figure in the minor's life. Barrientos believed, based upon her conversations with the minor, the child viewed her caregivers as her mother and father and father to be "a fun, friendly person" to have visits with. Barrientos opined that, to the extent that the minor derived some benefit from visits with father, they did not outweigh the benefits the child would receive from adoption and

14

"being in a structured, loving home environment [with people] who are committed to providing permanency to [the minor]."

## 2. Testimony of Father

Father testified that since the 18-month review hearing in July 2020, he had attended a substance abuse program at Proyecto Primavera that he had completed in December 2020. He had been clean and sober since March 2020.[7] Father had continued with drug testing at his own expense after the Department ceased paying for it in July 2020, and the results of all such tests had been negative. He admitted he had only tested once in November 2020, and that the test was for alcohol only. Since July 2020, he had consistently attended 12-Step meetings, initially twice a week and more recently daily, working in a service capacity for the program. Father had completed a relapse prevention program. He had also completed a 52-week domestic violence class in August 2020.

It was father's understanding that the minor had been removed from his care because, after he was released from custody, the Department had "accused [him] of negligence, because [he] left her with the babysitter." He stated that he had become depressed after losing custody of the minor and had relapsed. Father denied that his substance abuse while the minor was under his care caused him to neglect her or that it had any impact on the child.

Father testified that he had had supervised visits with his daughter for four hours on Saturdays. The visits went very well; father and the minor both enjoyed them. The child called him "[d]addy" during the visits. The visits had recently taken place by video

---

[7] Father testified on cross-examination, that the positive drug tests from February and March 2020 about which the Department confronted him were not the result of his having actually used methamphetamine; instead, he claimed that at those times, he had been with people who had been using drugs for which he took responsibility.

15

due to the COVID-19 pandemic. He had difficulty with a few video visits because of technical reasons.

Father testified that he and the minor were very attached to one another, and that he had taken care of her since birth. He testified that he did not believe that his substance abuse had had any impact on the minor during the time he had cared for her. Father stated he loved the minor very much and the minor loved him. Father had been renting a room in the two-bedroom apartment of his adult nephew and had done so since November 2019. Father testified that it was a suitable home in which the minor could live. He was working full time and his salary was sufficient to support the minor and him.

Father acknowledged that the minor was closely bonded with the caregivers and that the child loved them. He testified that he did not believe it would be disruptive to the minor if she were returned to his care; "[s]he would be happy." But father later testified that he felt it would hurt the minor "for a time" if she were separated from people she had come to rely on and love, but that "it would hurt her more to be separated from her father."

### 3. Juvenile Court's Ruling

After hearing the evidence and argument of counsel,[8] the court denied father's 388 petition. The court observed that although there was a factual dispute concerning the length of time father had been free of drug use, "giving [father] the benefit of the doubt, . . . ten months of sobriety, even in the context of his history of substance abuse, is a material change [of circumstances]." But the court denied the 388 petition, specifically concluding that the relief father sought, return of the child to his care with family maintenance services, was not in the minor's best interests.

---

[8] Counsel for the minor argued that father's 388 petition should be denied, and that the court should find the minor adoptable and terminate mother's and father's parental rights.

16

With respect to the 366.26 hearing, the court adopted the recommendations of the Department. The court found the minor to be adoptable, terminated the parental rights of mother and father, and found adoption to be the permanent plan. In so concluding, the juvenile court found that the parental-benefit exception to adoption did not apply, finding implicitly that any detriment to the minor from the termination of parental rights did not outweigh the benefits the minor would receive from a stable adoptive home. Specifically, the court found that father had "been extremely consistent with his visits," was "bonded with . . . his daughter," had "shown exceptional devotion to [her]," and had "an attachment to" the minor from which she benefited. And although the juvenile court—indicating that it was looking at the issue of detriment from "[the minor's] perspective"—concluded that severing the minor's relationship with father would be "a loss" to her, it also found that the loss was one "[the minor] would be able to adjust to." The court noted that the caregivers had "occupied the parental role" for the past one and one-half years of the minor's life.

## II. DISCUSSION

### A. Selection and Implementation Hearings Under Section 366.26

#### 1. *Generally*

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the selection and implementation hearing as provided under section 366.26. The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children." (*Id*., subd. (b).) As the California Supreme Court has recently explained, "[a]t the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child. [Citations.] In fact, it is not permissible to order reunification at the section 366.26 hearing. [Citations.] Indeed, when the court orders the section 366.26 hearing, reunification services have been terminated, and the

17

assumption is that the problems that led to the court taking jurisdiction have not been resolved.  [Citation.]"  (*Caden C.*, *supra*, 11 Cal.5th at p. 630.)

There are seven statutory choices for the permanency plan; the preferred choice is adoption, coupled with an order terminating parental rights.  (§ 366.26, subd. (b); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["Legislature has thus determined that, where possible, adoption is the first choice"]; *ibid.* [where child is adoptable, "adoption is the norm"].)  The court selects this option if it "determines . . . by a clear and convincing standard, that it is likely the child will be adopted."  (§ 366.26, subd. (c)(1).)

Thus, at the 366.26 hearing, "in order to terminate parental rights, the court need only make two findings:  (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated. . . .  '[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued.  In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted.' [Citation.]"  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250.)

As noted, if the court makes the two aforesaid determinations, it is required to terminate parental rights to allow for adoption of the child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 630.)  But a parent may avoid this result if he or she establishes "that the termination of parental rights "would be detrimental to the child due to one or more of . . . [six statutory] circumstances."  (§ 366.26, subd. (c)(1)(B).)  As discussed below, one such circumstance—which is at issue here—is the parental-benefit exception.

If the juvenile court makes a finding that one of the statutory circumstances presents "a compelling reason" for determining that the termination of rights would be a detriment to the child (§ 366.26, subd. (c)(1)(B)), the court should select a permanent plan alternative to adoption.  (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).)  "In other words, when a parent establishes that one of the exceptions applies, adoption or

18

termination is not 'in the best interest of the child.' [Citations.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

It must be emphasized, however, that the six specified circumstances in section 366.26, subdivision (c)(1)(B) are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53, original italics.) They " 'must be considered in view of the legislative preference for adoption where reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*, original italics.)

### 2. *Parental-Benefit Exception to Adoption*

The parental-benefit exception was asserted by father below and is the central issue on appeal. Under this exception, the juvenile court will not terminate parental rights if it " 'finds a compelling reason for determining that termination would be detrimental to the child . . . [¶] [because t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The Supreme Court has construed the statute to provide that there are "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would benefit the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Ibid.*, original italics; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576 (*Autumn H.*) [recognized by *Caden C.*, *supra*, at p. 631, as "the seminal decision interpreting the exception"].)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

19

" 'Sporadic visitation is insufficient.' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643, disapproved on other grounds in *Caden C.*, *supra*, at p. 637, fn. 6.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) In focusing upon the child in assessing benefit, the juvenile court "must remain mindful that rarely do 'parent-child relationships' conform to an entirely consistent pattern. [Citations.]" (*Ibid.*)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also § 366.26, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the

20

parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.)

Therefore, as explained in *Caden C.*, "[i]n each case, . . . the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. (*Ibid.*) That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent. (§ 366.26, subd. (c)(1)(B)(i), italics added.)" (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

The Court of Appeal in *Caden C.* had reversed the juvenile court's finding of the existence of the parental-benefit exception, concluding that "because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp 625-626.) The Supreme Court held that the appellate court erred in its emphasis of the mother's noncompliance with her case plan in denying the parental relationship exception. (*Id.* at p. 626.) The high court explained: "A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception. . . . [M]aking a parent's continued struggles with the issues leading to

dependency, standing alone, a bar to the exception would effectively write the exception out of the statute. . . . [W]hen the court sets a section 366.26 hearing, it terminates reunification services for the parent. [Citation.] Thus, when the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency. [Citation.] The parental-benefit exception can therefore only apply when the parent has presumptively *not* made sufficient progress in addressing the problems that led to dependency. . . . Parents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id.* at p. 637, original italics, fn. omitted.) The *Caden C.* court concluded that "the parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it? The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." (*Id.* at p. 638.)

The high court also explained that a parent's failure to demonstrate the likelihood of being able to assume a custodial role does not preclude application of the exception. It held: "[W]hether the parent is or is not 'ready for the children's return to her custody' is not, by itself, relevant to the application of the parental-benefit exception. [Citation.] If termination of parental rights would, when weighed against the offsetting benefits of an adoptive home, be detrimental to the child, the court should not terminate parental rights, even if the parent has not demonstrated a likelihood that he or she will ever be able to regain custody. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 638, fn. omitted.)

The burden is on the parent to prove the parental-benefit exception by a preponderance of the evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Thus, "[t]he

parent must show [1] regular visitation and contact with the child, taking into account the extent of visitation permitted . . . [2] the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship . . . [and 3] that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Ibid.*)

### B.    Standard of Review

The California Supreme Court in *Caden C.*, *supra*, 11 Cal.5th 614 clarified the standard of review applicable for a juvenile court's finding regarding the parental-benefit exception. The high court explained that Courts of Appeal had employed three different standards: substantial evidence, abuse of discretion, and a " 'hybrid' standard . . . [in which] regular visitation and . . . [existence of] a beneficial relationship [findings are reviewed] for substantial evidence but whether termination would be detrimental [is reviewed] for abuse of discretion." (*Id.* at p. 639.) The *Caden C.* court held that the hybrid standard of review applied. (*Id.* at p. 640; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [enunciating the hybrid standard of review].)

The high court noted that the first two elements—regular visitation and a beneficial relationship—involved determinations that were essentially factual and thus should be reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) The third element—detriment to the minor resulting from termination—the Supreme Court explained, is different. Like the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's relationship with a parent. (*Ibid.*) In determining detriment, however, the juvenile "court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision is not the same as a determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home

23

without the parent in his life.  [Citation.]  The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home.  And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

### C.      No Error in Finding the Parental-Benefit Exception Inapplicable

Father argues on appeal that the juvenile court abused its discretion in connection with its determination that the parental-benefit exception did not apply.[9]  He contends that the court based its conclusion that the exception was inapplicable upon an improper consideration, i.e., that father did not occupy a parental role in the minor's life.  He asserts that under *Caden C.*, *supra*, 11 Cal.5th 614, the juvenile court should not have considered this "parental role" criterion in determining whether there was a beneficial relationship between father and child.  Father argues further that the court did not properly weigh the evidence to determine the extent of detriment that would result from termination of the parental relationship, instead emphasizing father's not playing a parental role in the child's life.

### *1.      Regular Visitation*

The parties agree that the juvenile court held that father had satisfied the first component of the parental-benefit exception, i.e., regular visitation and contact.  (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)  In reaching this conclusion, the court found that father

---

[9] Father's notice of appeal reflects challenges to both the juvenile court's denial of father's 388 petition and to its section 366.26 order terminating parental rights and declaring adoption to be the permanent plan for the minor.  Father's position in his appellate briefs is solely that the court erred in terminating parental rights and declaring adoption to be the permanent plan.  Father has abandoned any claim of error with respect to the juvenile court's denial of father's 388 petition.  (*Tanner v. Tanner* (1997) 57 Cal.App.4th 419, 422, fn. 2 [appellate court may treat as partial abandonment of appeal where appellant fails to challenge in opening brief an order specified in notice of appeal].)

had "been extremely consistent with his visits." There was substantial evidence supporting this express finding. (See *id.* at p. 640.)

### 2. *Existence of Beneficial Relationship*

Father contends on appeal that he satisfied the second component of the parental-benefit exception, namely, whether "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) He asserts that "the court declined to find the relationship beneficial on grounds that father did not occupy a 'parental role' in A.L.'s life." Father argues that under *Caden C.*, *supra*, 11 Cal.5th at page 630, the parent's failure to occupy a parental role does not preclude a finding that the child would benefit from continuing the relationship with such parent.

We do not read the record as showing that the juvenile court made a finding that the minor would not benefit from continuing the relationship with father. To the contrary, the court found that father "is bonded with . . . his daughter," he "has shown exceptional devotion to [her]," and "he does have an attachment to [the minor] and she benefits from that attachment." The juvenile court also concluded that severing her relationship with father would be "a loss" to the minor. We therefore conclude that the juvenile court—contrary to father's contention—held that father in fact had satisfied the second component of the parental-benefit exception.[10] There was substantial evidence supporting this express finding. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

### 3. *Weighing Severance Detriment vs. Benefits of Adoptive Home*

Father contends that the juvenile court erred by failing to properly consider the third prong of the parental-benefit exception—whether "the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631, original italics.) He asserts that the juvenile court abused its discretion by failing to complete "the

---

[10] The Department has conceded for purposes of this appeal that the second prong of the exception was satisfied.

complex task of reaching a detriment finding [and instead] merely relying on father's and the caretakers' [respective] parental role status[es]." Father contends that, in assessing detriment, the juvenile court was required—and, implicitly, that the court failed to do so here—to "determine . . . how the child would be affected by losing the parental relationship[, i.e.,] what life would be like for the child in an adoptive home without the parent in the child's life." This claim of error fails.

First, father's argument that the court simply considered the respective parental roles of the foster parents and father assumes that the juvenile court's detriment conclusion was based only upon the matters it stated on the record. We do not read the record to reflect that the court's conclusion was so limited. To the contrary, the record indicates that the court's statements on the record were not intended to be a comprehensive recitation of the grounds for its decision. After completion of testimony and argument at the combined hearing on the 388 petition and selection and implementation, the juvenile court judge stated, "[W]e've already run out of time," but "I really would hate to make you come back for a decision." The judge then stated he would gather his thoughts "to see if I can give you my decision right now even though it's not going to be the most fluid decision." After a recess was then, the judge returned to give his ruling.

Further, we are aware of no requirement—and father cites no authority supporting the proposition—that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception. To the contrary, we infer from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to "state its reasons in writing or on the record" when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental. (See *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109 [appellate record supported implied finding by

26

juvenile court that parents had failed to establish parental-benefit exception]; see also *Lydig Construction, Inc. v. Martinez Steel Corp.* (2015) 234 Cal.App.4th 937, 945 [appellate court presumes that trial court "considered all the pertinent matters presented to it"].) Thus, although a statement by the trial court of its findings (or reasons) for its decision is helpful in conducting appellate review, it was not a legal requirement in this instance.

Second, contrary to father's claim on appeal, there is no indication from the record that the court failed to weigh the potential benefits that adoption would afford the minor against the potential harm of the loss of the relationship with father. (See *People v. Thomas* (2011) 52 Cal.4th 336, 361 [appellate court "presume[s] that the [trial] court 'knows and applies the correct statutory and case law' "].) The record shows that in announcing its decision, the court noted that, looking at the issue of detriment from "[the minor's] perspective," "not [having father] in her life" because of the termination of the father-child relationship "would be a loss" but it would be one "[the minor] would be able to adjust to." In so reasoning, the court noted that the caregivers had "occupied the parental role" for the past one and one-half years of the minor's life.

Third, contrary to father's position, in assessing potential detriment, it was proper for the juvenile court to consider whether, and the extent to which, the caregivers and father occupied parental roles with the minor. In fact, the Supreme Court acknowledged that "[i]n many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Thus, the strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding. Based upon our review of the record, that weighing duty was performed by the juvenile court here.

27

Father argues, however, that "in light of *Caden C.*, a parent is no longer required to show that the parent occupied a 'parental role' in the child's life." We do not read *Caden C.* as containing this conclusion. Indeed, the Supreme Court did not use the term "parental role" at all, other than to recite that the trial court, in determining whether the parental-benefit exception applied, had found that the mother " 'does stand in a parental role to her son.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 628.) Further, the holding in *Caden C.* had nothing to do with whether the juvenile court or the Court of Appeal had considered mother or the caregivers to have occupied "parental roles" (regardless of whether that precise phrase was used) in the child's life. Rather, the high court reversed because the appellate court's reasons for deciding that the juvenile court had erred in finding the exception applicable—namely, that because the mother had failed to maintain her sobriety or to address her mental health issues, no reasonable court could have applied the exception—were improper. (*Id.* at pp. 641-642.)

To be clear, although the Supreme Court did not state that, to prove the exception, a parent need not establish that he or she occupies a "parental role" in the child's life, it did conclude that "[w]hen it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C.*, *supra*, 11 Cal.5th at p. 634; see also *ibid.* ["366.26 hearing is decidedly not a contest of who would be the custodial caregiver"].) And the high court explained that "whether the parent is or is not 'ready for the children's return to her custody' is not, by itself, relevant to the application of the parental-benefit exception." (*Id.* at p. 638.) The record here does not show that the juvenile court based its decision that the exception did not apply, in whole or in part, upon the finding that father was not ready to have the minor returned to his custody.[11]

---

[11] We reiterate that the juvenile court addressed at the hearing on January 13, 2021, both father's 388 petition and selection and implementation. Social worker Barrientos expressed concerns about whether the minor could be safely returned

28

Fourth, the weighing function of the juvenile court in addressing the third prong is founded on the juvenile court asking this question: "[D]oes the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Here, viewing the potential benefit of placement, the minor had done extremely well in the 19-plus months she had been living with her prospective adoptive family. The evidence uniformly showed that it was a stable and very loving home. The minor had made a good adjustment, and at a very early stage, the caregivers had indicated their willingness to adopt the minor. As time evolved, the minor became very close to the caregivers' goddaughter, whom the minor saw frequently. The minor also blossomed in the role of big sister in February 2020, when the caregivers undertook the care of a safely-surrendered baby; the minor became closely attached to her. The minor had told social workers that she was very happy living with the caregivers, whom she called " 'mommy,' 'mom,' 'dad,' and 'daddy,' " and she loved them. She had also expressed to the social worker that she did not want to be moved. Social worker Barrientos had observed that the minor was very attached to the caregivers, the child viewed them as her mother and father, and they consistently met all of the child's physical and emotional needs. Father himself acknowledged that (1) the minor was closely bonded with the caregivers, (2) she loved them, and (3) she would be hurt if she were separated from them.

---

to father's care based upon, inter alia, father's substance abuse history and because he was still in the early stages of recovery. While this evidence concerning whether father was ready to safely assume a custodial role may have had limited utility on the issue of the applicability of the parental-benefit exception, it was of significance to whether father had established in the 388 petition that father's assumption of custody was in the minor's best interest. (See *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808 [§ 388 petition properly denied where no evidence that it was in child's best interest that he return to mother's care, where there had been history of physical abuse by father and exposure to domestic violence.])

Balancing the potential benefit of placement in a new, adoptive home against the potential harm from the child's loss of the positive, emotional relationship with father, includes, as noted, consideration of " 'the strength and quality' " of the relationship between the natural parent and child. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Here, there was evidence, including opinion evidence from social worker Barrientos, that father (1) had not been involved in the child's medical decisions or issues, (2) had not been involved in the minor's educational decisions or her schoolwork, (3) was not a parent figure in the minor's life, and (4) was viewed by the child as being "a fun, friendly person" to have visits with. Although father's visits with the minor were consistent and positive, Barrientos observed that the minor had no difficulty separating from father at the end of visits, and that the child was not affected and was easily redirected when father had missed scheduled video visits.

Further, although father testified that his substance abuse while he was the custodial parent (March 2015 to November 2018) had no negative effect upon the minor, the juvenile court disbelieved him. The court concluded that father's testimony regarding this issue, along with his denial of methamphetamine use despite positive test results in February and March 2020, was not credible.[12] (See *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329 [appellate court may not substitute its assessment of the credibility of a witness in place of the credibility assessment of the trial court'].) This evidence that father's prior substance abuse had negatively impacted the minor was germane to the court's assessment of " 'the strength and quality' " of the parent-child relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) "[I]ssues such as those that led to dependency

---

[12] The court stated as follows: "I am still concerned about some of the statements that [father] made today regarding the notion that his substance abuse did not have any impact on [the minor] as well as the claim that the positive tests in February and early March were not the result of actual use of methamphetamines, but being around people who are using. I don't really find those explanations to be credible. But there's no doubt that [father] has worked really hard."

often prove relevant to the application of the exception. . . . A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child. [Citation.]" (*Id.* at p. 637.)

Barrientos opined that to the extent that the minor derived some benefit from visits with father, they did not outweigh the benefits the child would receive from adoption and "being in a structured, loving home environment [with people] who are committed to providing permanency to [the minor]." The juvenile court was entitled to rely on the opinions of social worker Barrientos, an expert qualified to testify concerning risk assessment and permanent placement issues, in performing its balancing functions relative to the third prong. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 53 ["trial court was entitled to find the social worker credible and to give greater weight to her assessments and testimony"], disapproved on another ground in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5; see also *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420-1421.)

Father also notes—addressing his substance abuse history and his compliance with his plan requirements during the time he received reunification services—that under *Caden C.*, *supra*, 11 Cal.5th at pages 637 to 638, "a parent's continued struggles with issues leading to dependency are not a categorical bar to applying the parental-benefit exception" and "may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent." Father provides a lengthy discussion of this issue in his opening brief. This is an accurate statement of the Supreme Court's holding. (See *Caden C.*, *supra*, at pp. 637-638.) The point is, however, not relevant here; the record does not show that the juvenile court based its detriment finding upon father's continued struggles with substance abuse or assigned blame or made moral judgments because of any failings by father. (Cf. *In re B.D.* (2021) 66 Cal.App.5th 1218, 1228 [reversal of § 366.26 order based upon juvenile court's having "relied heavily, if not exclusively, on

31

the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long term and continued substance abuse"].)[13]

*In re J.D.* (2021) 70 Cal.App.5th 833 (*J.D.*) does not suggest error in the present case. There, in an appeal—filed before *Caden C., supra*, 11 Cal.5th 614 was filed (*J.D.*, *supra*, at p. 840)—from an order terminating parental rights, the agency argued that the mother had failed to satisfy the second and third elements of the parental-benefit exception. (*Id*. at p. 854.) The appellate court in *J.D.* focused on the second element, i.e., whether the mother established the existence of a beneficial relationship with the child. In doing so, the court described significant evidence that supported a finding in favor of the mother on the second element, including the caregivrer's report that there was a positive bond between mother and child (*id.* at p. 856); the mother having showed love, encouragement, and support toward the child during visits (*id.* at pp. 856-857); the visits having "reflected many intimate moments and exchanges" and many occasions in which the child sought the mother's attention (*id.* at 858); and the child having frequently expressed a desire to go to the mother's house (*ibid.*). The *J.D.* court observed that the juvenile court had "made few explicit factual findings concerning the parental benefit exception," noting that two findings were that the minor had "a relationship with mother and that it [was] a positive one[ b]ut it . . . did not 'amount to [a] parental bond.' " (*Id*. at p. 851.) The appellate court concluded that, because "the court appear[ed] to have applied the wrong legal standard under *Caden C.* in evaluating the second element" (*id.* at

---

[13] We note that at the combined hearing, there was extensive testimony concerning father's substance abuse history, his relapses during the time he received reunification services, the length of time before the hearing that he had abstained from use of substances, and the progress he had made toward recovery. Regardless of their significance to the court's determination of whether the parental-benefit exception applied, these were all issues of high relevance to the court's decision on the 388 petition. (See *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53 [in denying § 388 petition, court properly considered parent's substance abuse history, relapses, and progress toward recovery], disapproved on another ground in *Caden C*., *supra*, 11 Cal.5th at p. 636, fn. 5.)

p. 865), it was compelled to reverse and remand the case with instructions to conduct a new 366.26 hearing applying the principles enunciated in *Caden C.* (*id.* at p. 870).

In contrast to *J.D.*, here, we have concluded that *the juvenile court found* that there *was* a beneficial relationship that existed between father and the minor. Therefore, father's claim that the court erred in finding the second element had not been established because of the court's reliance upon improper factors under *Caden C.* (i.e., that father had not assumed a "parental role") is without merit. Moreover, *J.D.* is factually distinguishable and does not suggest in this case that the court below erred.[14]

As we have noted, the juvenile court was not required to state its findings in concluding that the parental-benefit exception did not apply. Further, the reasoning provided by the court at the conclusion of the hearing was not intended to be a recitation of the exclusive bases for the court's decision. Moreover, although father urges that the juvenile court based its decision upon grounds identified in *Caden C.*, *supra*, 11 Cal.5th 614 to be improper, the record does not support that conclusion. " 'We must indulge in every presumption to uphold a judgment, and it is [appellant's] burden on appeal to affirmatively demonstrate error—it will not be presumed. [Citation.]' [Citation.]"

---

[14] Similarly, *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*) does not support father's claim of error. In *D.M.*, the appellate court reversed the order terminating parental rights and remanded the case for a new 366.26 hearing, concluding that the juvenile court, which did not have the benefit of the Supreme Court's decision, applied improper factors under *Caden C.* in concluding that the beneficial relationship exception was inapplicable. (*Id.* at p. 264.) The appellate court concluded, inter alia, that substantial evidence did not support the juvenile court's finding that the father had not established the second element, the existence of a beneficial parental relationship. (*Id.* at p. 270.) The *J.D.* court thus reversed, reasoning that "[t]he court's express findings that father did not act like a parent demonstrate it considered factors which *Caden C.* has explained are inappropriate in determining whether the parental-benefit exception applies. [Citation.]" (*Id.* at p. 271.) *D.M.*—which is also factually distinguishable— does not support father's claim of error here.

(*People v. Tang* (1997) 54 Cal.App.4th 669, 677.)  Father has not demonstrated error, and it will not be presumed here.

It is very apparent to this court that father loves his daughter very much.  It is clear, however, that the juvenile court did not abuse its discretion in concluding that father had not established the third prong of the parental-benefit exception.  The court, after weighing the benefits to the minor in receiving a permanent adoptive home against any detriment to the child resulting from the termination of the parental relationship, properly found that father had not shown that the minor's relationship to him was "so important to the child that the security and stability of a new home wouldn't outweigh its loss."  (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

### III.    DISPOSITION

The juvenile court's January 13, 2021 order denying father's 388 petition and order after the 366.26 hearing terminating parental rights and declaring adoption to be the permanent plan for the minor are affirmed.

_____
                                    BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
LIE, J.

*In re A.L.; DFCS v. E.C.*
**H048761**

| Trial Court: | Santa Clara County |
| | Superior Court Nos.: 118JD025484 |

Trial Court:                          Santa Clara County
                                      Superior Court Nos.:  118JD025484


Trial Judge:                          The Honorable Patrick E. Tondreau
                                      The Honorable Frederick S. Chung


Attorney for Defendant and Appellant  Jacob I. Olson
E.C..                    :            under appointment by the Court of
                                      Appeal for Appellant




Attorneys for Plaintiff and Respondent   James R. Williams,
Santa Clara County Department of Family  County Counsel
and Children Services:
                                         Susan P. Greenberg,
                                         Deputy County Counsel

*In re A.L.; DFCS v. E.C.*
**H048761**