Filed 11/17/25  P. v. M.R. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H052476 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. 22JV000846) |
| v. | |
| M.R., | |
| Defendant and Appellant. | |

M.R. was born in 2006.  In December 2022, when M.R. was 16 years old, he was charged with murder in a juvenile wardship petition.  The prosecutor moved to transfer M.R. to criminal court for prosecution as an adult.  After M.R. was detained in a juvenile facility for approximately two years, the juvenile court granted the motion.  M.R. now appeals the transfer order, arguing that the court abused its discretion by considering an improper factor: the likelihood of rehabilitation in the state prison system.  As explained below, we reject this argument and affirm the transfer order.

## I. BACKGROUND

### A. The Juvenile System

There are significant differences between the juvenile and adult criminal systems. (See *In re Julian R.* (2009) 47 Cal.4th 487, 496.)  Most fundamentally, "[t]he former seeks to rehabilitate, while the latter seeks to punish."  (*Ibid*.)  Accordingly, a prosecutor

charges a minor with an offense by filing a petition to declare a minor a ward of the state rather than a criminal complaint. (Welf. & Ins. Code, §§ 607, subd. (a), 653.7, 655.) (Subsequent undesignated statutory references are to the Welfare and Institutions Code.) Minors admit or deny wardship petitions rather than pleading guilty or not guilty (§ 702.3), and in juvenile court, rather than a trial before a jury, there is a jurisdictional hearing presided over by a judge from the juvenile court. (§ 602, subd. (a).) If the juvenile court finds (beyond a reasonable doubt) that the allegations in the wardship petition are true, the minor is adjudged a ward of the juvenile court. (*Ibid.*) The juvenile court then conducts a dispositional hearing at which the court may impose a wide variety of rehabilitation alternatives. (*People v. Vela* (2018) 21 Cal.App.5th 1099, 1105.) In the most serious cases, where no less restrictive alternative would be effective or appropriate, a minor may be committed to juvenile hall. (*Ibid*.)

A juvenile court's jurisdiction over a minor also is limited in duration. For most offenses, this jurisdiction lasts until the minor is 21 years old. (§ 607, subd. (a).) For murder, the period is a bit longer: A juvenile court may retain jurisdiction until the minor is 25 years old. (§ 607, subd. (c) [authorizing retention of jurisdiction over persons committing an offense listed in section 602, subd. (b)]; see also § 602, subd. (b)(1) [listing murder].) When a juvenile court's jurisdiction over an individual expires, the individual is released. (§ 208.5, subd. (a).)

If a minor aged 16 or over is charged with murder and certain other specified offenses, the prosecutor may move to transfer the case from juvenile court to adult criminal court. (§ 707, subd. (a)(1).) In determining whether to transfer a juvenile to adult criminal court, juvenile courts are required to consider five criteria: (1) the minor's degree of criminal sophistication; (2) whether the minor can be rehabilitated before the juvenile court's jurisdiction expires; (3) the minor's prior history of delinquency; (4) the degree of success of prior attempts by the juvenile court to rehabilitate the minor; and

2

(5) the severity and circumstances of the minor's alleged offense. (§ 707, subd. (a)(3)(A)-(E).) The second criteria is also the ultimate consideration: To transfer a minor to criminal court, a juvenile court must "find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).)

## B. M.R.'s Juvenile Warship Petition

### 1. The Shooting

Late one night in October 2022, M.R. went to a party with a slightly older, adult friend. As a Ring camera video showed, the friend got into an argument with Raymond Mattias. When M.R. became aware of the argument, he masked his face. M.R.'s friend pulled out a gun and fired eight shots at Mattias, who fell to the ground. M.R. also pulled out a gun and fired two more shots at Mattias, who died shortly thereafter.

### 2. The Wardship Petition

A month after the shooting, both M.R. and his friend were arrested. When M.R. was arrested, the police found on his phone pictures with known Norteño gang members, a picture of him with a fresh tattoo associated with Norteño gangs, and a press release about the shooting of Mattias. In early December 2022, the prosecutor filed a juvenile wardship petition alleging that M.R. committed willful, deliberate, and premeditated murder. The juvenile court ordered M.R. detained in juvenile hall.

## C. The Hearing

On December 6, 2022, the prosecutor moved to transfer M.R.'s case to a court of criminal jurisdiction. In several sessions from April through July 2024, the juvenile court heard the motion, and in August 2024 the trial court granted the motion.

### 1. The Prosecution's Witnesses

In addition to presenting testimony from the officers who investigated the shooting and M.R.'s involvement with Norteño gangs, the prosecutor presented witnesses

concerning M.R.'s conduct while detained in juvenile hall and his prospects for rehabilitation there.

The prosecution's main witness was Brenda Marshall, who testified over the course of four days. Marshall testified that she was a deputy probation officer, that she had interviewed M.R. and investigated his case, and that she had come to the conclusion that he was not amenable to rehabilitation. She noted that M.R. had received counseling and therapy starting in elementary school and continuing through his teenage years and that he was engaging in some programs, but that he generally did not fully comply with programs or probation conditions until the end of his probationary period or the approach of a court hearing. M.R. also claimed that his substance-abuse therapy was helpful, but afterward he repeatedly resumed abusing drugs. From these facts, Marshall concluded that M.R. was not committed to rehabilitation.

Marshall also noted troubling behavior by M.R. In particular, he continued to associate with gang members at juvenile hall. He also appeared to have attempted to smuggle contraband into the facility and to be receiving money from the gang, an indication that he was unwilling to leave the gang. He had lengthy phone calls with other apparent gang affiliates who coordinated contraband smuggling with him and in at least one case advised him that someone was an informant. M.R. also had gotten into at least one fight with another minor, and an officer had to go "hands on in order to control the situation." And M.R. repeatedly displayed disrespect and aggression towards female staff members.

The prosecutor also presented testimony from two juvenile hall staff members. The first was Mike Palmer, the probation services manager. Through Palmer, the prosecution introduced over 30 incident reports about M.R., which Palmer observed was more than most juveniles at the facility. The majority of these incidents involved attempts to smuggle contraband into juvenile hall. Palmer testified that, when caught,

4

M.R. always promised to do better, but then reverted to the same offenses. Palmer also testified that he had never observed M.R. display any genuine interest in abandoning his gang affiliation and opined M.R. was not interested in rehabilitative programming. Finally, Palmer noted various deficiencies with the rehabilitative courses available at the facility where M.R. was detained, including that there was no way to isolate former gang members from current ones.

Julie Kenyon, the division director for the juvenile hall's secure track program, testified as well. Like Palmer, Kenyon testified that she had repeatedly observed M.R. promise to stop committing offenses but then return to doing so. In addition, at one point M.R. was able make it to an honor dorm where additional programming was available; however, when there was a gang fight in the main housing unit, and a Norteño gang member called for affiliates in the dorm to return to the unit, M.R. did so. When asked if M.R. was amenable to rehabilitation, Kenyon testified that in her experience, "anybody . . . who continues to engage themselves in criminal street gangs is not likely to be amenable to any type of rehabilitation in a custodial facility or out." Kenyon also noted some of the juvenile hall's limitations as a rehabilitative environment, including that in recent years, older offenders from more secure but now-defunct juvenile facilities had been transferred to the hall; these individuals taught younger offenders, including M.R., sophisticated smuggling techniques.

Finally, the People presented testimony from Raythel Fisher, a retired state prison warden. Fisher testified that he had helped establish programs making his prison "a youthful rehabilitative community" and one of ten state prisons categorized as "youthful offender program institutions." Fisher also testified that, in his experience, gangs disrupt and inhibit rehabilitation, and therefore his institution prohibited open representation of gang affiliation, removed youth offenders who refused to renounce gang behavior from rehabilitative programs, and sent them to higher-security prisons.

Fisher toured the juvenile facility where M.R. was detailed. Fisher was troubled to see that there was "a lot of idleness," no effective way to isolate former gang members from current gang members, and no programs productively informing gang members and affiliates how and why to remove themselves from the gang lifestyle. As a result, Fisher believed that gang members and affiliates at the facility would not separate from their gang out of "fear of being victimized, ostracized." In addition, in his opinion, the presence of contraband drugs in the facility impeded participation in any rehabilitative programming. Accordingly, when the prosecutor asked Fisher for his opinion whether an individual in M.R.'s circumstance was likely to be able to rehabilitate by the time he was 25 years old, Fisher responded that "[m]y personal and my professional experience tells me no."

The prosecutor also sought to elicit an opinion from Fisher that the state youthful offender program was the only program with a chance to rehabilitate M.R. However, when the prosecutor asked if the youthful offender program would give M.R. a better shot at rehabilitation, M.R.'s counsel objected to the relevance of the question, and the juvenile court sustained the objection.

### 2. *M.R.'s Witness*

M.R. presented one witness: Dr. Rahn Minagawa, a psychologist. Dr. Minagawa highlighted a number of traumatic incidents suffered by M.R., including physical abuse by his father, a car accident in which a friend died, watching gunfire hit another of his friends, and losing still another friend to gang violence. Dr. Minagawa also noted that M.R. was being treated for depression, anxiety, and attention-deficit hyperactivity disorder.

Examining the five factors governing juvenile transfers, Dr. Minagawa opined that all five indicated M.R. was amenable to rehabilitation. According to Dr. Minagawa, (1) M.R.'s offense showed impulsivity rather than criminal sophistication; (2) M.R. could

6

be rehabilitated before the juvenile court's jurisdiction expired because he had completed some programming while detained, and most offenders stop their criminal behavior as they age and mature; (3) M.R.'s prior delinquent history was limited, mostly probation violations and one robbery at age 14; (4) previous attempts at rehabilitation had failed because they did not address M.R.'s psychological conditions; and (5) although the current offense was severe, M.R. was only 16 at the time and had been under the influence of drugs.

On cross-examination, Dr. Minagawa acknowledged that he had believed M.R.'s representation that he was not a gang member, which Dr. Minagawa had come to understand was a lie, and that M.R. had shown criminal sophistication by concealing his face before the shooting. However, Dr. Minagawa did not change his opinion that M.R. was amenable to rehabilitation. Indeed, in sharp contrast to Fisher's testimony about the youthful offender programs in state prison, Dr. Minagawa asserted that there were "programs that would be available to [M.R.] as a minor that would not be available to him in the adult prison population until he was getting close to being released."

### 3. The Order

On August 16, 2024, the juvenile court read its written order granting the motion to transfer M.R. to criminal court. The court found that the People had satisfied their burden of showing, by clear and convincing evidence, that M.R. was not amenable to rehabilitation before the juvenile court's jurisdiction expired.

Indeed, the juvenile court found that each of the five statutory factors weighed in favor of transfer. First, the court observed that M.R. showed criminal sophistication in the murder by masking his face and giving evasive answers to police investigators as well as in his smuggling and gang coordination activities while in the juvenile facility. Accordingly, the court concluded that the criminal sophistication factor "weighs in favor of transfer . . . to a court of criminal jurisdiction." Second, considering M.R.'s

7

amenability to rehabilitation while in the juvenile court's jurisdiction, the trial court noted that "it is apparent that this minor has no desire or intent to forgo his criminal behavior and affiliation with the Norteño criminal street gang to engage in earnest rehabilitation." Among other things, M.R. continued to be deeply involved in gang culture and gang-related activities such as fighting another juvenile and bragging to other gang members about how he had "cracked" his opponent, trying to give himself a gang tattoo, and exercising authority over gang affiliates at the facility. The juvenile court was especially troubled by M.R.'s compliance with the call for gang members in the honor dorm to leave the dorm, where they had greater access to programming, and return to the main housing unit to help strengthen the gang's position. Accordingly, even though M.R. completed some programming while in juvenile hall, the court found that the amenability-to-rehabilitation factor "weighs in favor of a transfer to a court of criminal jurisdiction."

The juvenile court also found that the remaining three factors weighed in favor of transfer. In examining M.R.'s prior delinquent history, the court noted M.R.'s "very poor performance on probation and continued criminal conduct," and it concluded that the prior history factor showed "the minor is not amenable to rehabilitation while under the jurisdiction of juvenile court." Examining past attempts to rehabilitate, the trial court noted that before placing M.R. in juvenile hall, it had exhausted all prior program options and that the rehabilitative programming at the hall had made "no impact on his minor's criminogenic mindset and actions." Accordingly, based on past attempts at rehabilitation, the juvenile court once again found M.R. "not amenable to rehabilitation while under the jurisdiction of the juvenile court." Finally, the trial court found the alleged offense— shooting a defenseless victim as he lay on the ground—extremely grave, especially as after shooting the victim M.R. fled the scene rather than offering any aid. Accordingly, the court concluded that the circumstances and gravity of the alleged offense also showed

8

that M.R. "is not amenable to rehabilitation while under the jurisdiction of the juvenile court."

Finally, "[t]aking into consideration the totality of all the factors," the trial court concluded that "the People have met their burden, by clear and convincing evidence, that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" and therefore should be transferred to a court of criminal jurisdiction to be tried as an adult.

In rendering its opinion, the juvenile court referred to Fisher's testimony. The court noted Fisher's testimony that, "if one's entrenched in gangs, it is difficult to change," and that the juvenile facility where M.R. was housed was unable to separate individuals who wanted to reject the gang lifestyle from those who are still active gang members—which, Fisher observed, "would hinder rehabilitation." Later, building on this testimony, the trial court observed that, unlike in state prison, in juvenile hall M.R. "would not be out of the gang-involved community that he has surrounded himself with" and instead would "be in his comfort zone."

Finally, after concluding that M.R. was not amenable to rehabilitation while under the jurisdiction of the juvenile court and should be transferred to criminal court for trial as an adult, the court observed that M.R. would not be served by remaining in a community in which he has significant gang ties and relationships and that it would be in his best interests, as well as the community's, to transfer him to a court of criminal jurisdiction.

The day the transfer order was issued, M.R. filed a notice of appeal.

## II. DISCUSSION

Transfers to adult criminal court are reviewed for abuse of discretion. (See, e.g., *In re Miguel R.* (2024) 100 Cal.App.5th 152, 165.) M.R. contends the juvenile court abused its discretion by considering an improper factor: the rehabilitative programming

9

available in the state prison system.  We disagree.  The juvenile court considered the statutorily-mandated criteria and made the finding required for a transfer.  While the court mentioned the state prison system, it did so only briefly and appropriately in addressing those criteria and in commenting on the conclusion it reached.  We conclude that there was no abuse of discretion.

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; see also *People v. Giordano* (2007) 42 Cal.4th 644, 666 ["On appeal, we presume that a judgment or order of the trial court is correct . . . ."].)  This presumption of correctness extends to juvenile courts (see, e.g., *In re Sade C.* (1996) 13 Cal.4th 952, 994; *In re J.F.* (2019) 39 Cal.App.5th 70, 79), and it applies to legal as well as factual determinations (see, e.g., *People v. Coddington* (2000) 23 Cal.4th 529, 644, superseded by statute on another ground as stated in *People v. Zamudio* (2008) 43 Cal.4th 327, 356 & overruled on other grounds by *People v. Price* (2001) 25 Cal.4th 1046, 716, fn. 13).  Accordingly, "[i]n the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361 (*Thomas*).)

M.R. has not overcome the presumption of correctness.  The juvenile court considered the factors that the Welfare and Institutions Code requires courts to consider in deciding whether to transfer a juvenile to adult criminal court.  As noted earlier, the Welfare and Institutions Code requires courts to consider five criteria—degree of criminal sophistication, likelihood of rehabilitation prior to expiration of the juvenile court's jurisdiction, prior delinquent history, prior attempts to rehabilitate, and the circumstances and gravity of the alleged offense—and, ultimately, to find "by clear and

convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) Here, the juvenile court addressed each of the required five criteria and found that they all showed that M.R. was not amenable to rehabilitation. In addition, the court concluded, by clear and convincing evidence, that M.R. was not amenable to rehabilitation while under juvenile court jurisdiction. Thus, the juvenile court ordered M.R.'s transfer based on valid and appropriate grounds.

M.R. objects that the juvenile court considered Fisher's testimony concerning the programming available in the state prison system's youthful offender program. While that is true, the court did so to illustrate the difficulty of rehabilitating M.R. in the juvenile hall where he was detained. It noted Fisher's testimony concerning the difficulty of leaving a gang and his observation that in juvenile hall "the inability to separate gang 'drop-outs,' those who have rejected the criminal gang lifestyle[,] from those who are still active gang members, would hinder rehabilitation." Later, the juvenile court noted that in the state prison system M.R. "would have access to a different environment" as well as different people and more extensive programming. However, the court did so in order to contrast the situation in juvenile hall where M.R. "would not be out of the gang-involved community that he has surrounded himself with," a valid consideration in determining M.R.'s amenability to rehabilitation while in the juvenile court's jurisdiction.

As M.R. points out, the prosecutor argued that M.R. was more likely to be rehabilitated if he were transferred to state prison where he could be placed in a setting without the gang element in juvenile hall. However, nothing in the record indicates that the trial court considered the superior prospects for rehabilitation in state prison in ruling that M.R. should be transferred to adult criminal court. To the contrary, the trial court ruled that M.R. should be transferred because "the People have met their burden, by clear and convincing evidence, that the minor is not amenable to rehabilitation while under the

11

jurisdiction of the juvenile court."  Moreover, when the prosecutor asked Fisher whether the prison system would give M.R. "a better shot at long-term rehabilitation," the trial court sustained M.R.'s objection that the question was irrelevant.  Consequently, there is no basis for inferring that the trial court improperly considered the likelihood of rehabilitation in the state prison system in concluding that M.R.'s case should be transferred out of juvenile court.

It is true that, *after* finding that the M.R. was not amenable to rehabilitation under the juvenile court's jurisdiction and ruling that his case should be transferred, the juvenile court observed that it would be in the best interests of both M.R. and the community to transfer him to adult criminal court.  However, in light of the presumption that the court knew the law and properly applied it (see *Thomas*, *supra*, 52 Cal.4th at p. 361), we cannot assume from this statement that the juvenile court ordered the transfer because of the better prospects for rehabilitation in state prison.  Instead, we interpret this statement as a comment on the result reached, which is permissible and appropriate.  Indeed, the comment may have been a response to Dr. Minagawa's suggestion M.R. would be better served by the rehabilitative programs in juvenile hall.  In any event, the comment on M.R.'s best interests fails to make the affirmative showing needed to overcome the presumption of correctness.

Finally, M.R.'s reliance on *People v. Joe T.* (1975) 48 Cal.App.3d 114 (*Joe T.*), overruled on other grounds by *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 716, fn. 14, is misplaced.  In *Joe T.*, the Court of Appeal vacated a transfer order because the juvenile court's finding that the minor in that case was not amenable to rehabilitation in the juvenile system "was based *solely* on the referee's belief that the sentencing alternatives in the adult court would be better suited for appellant than the local treatment programs available through the juvenile court." (*Id.* at p. 119.)  This case is readily distinguishable.  Here, the juvenile court found that M.R. was not amenable to rehabilitation under the

12

juvenile court's jurisdiction based on a lengthy and detailed analysis of the statutorily-mandated factors. In addition, far from considering whether M.R. was more likely to be rehabilitated in the state prison system in analyzing those factors, it rejected the prosecutor's attempt to introduce an opinion on that subject as irrelevant. As a consequence, the error committed in *Joe T.* is absent here.

Accordingly, we conclude that the juvenile court did not abuse its discretion in deciding to transfer M.R. to adult criminal court.

### III. DISPOSITION

The order transferring M.R. to criminal court is affirmed.

13

_____
BROMBERG, J.

WE CONCUR:



_____
GREENWOOD, P. J.



_____
DANNER, J.



*People v. M.R.*
H052476